**Slip Op. 13-115**

UNITED STATES COURT OF INTERNATIONAL TRADE

MID CONTINENT NAIL CORPORATION,          :

                       *Plaintiff*,          :

        v.          :

UNITED STATES,          :

                   *Defendant*,          :          Court No. 11-00119
                                            PUBLIC

        and          :

ITOCHU BUILDING PRODUCTS CO., INC.,          :
   ET AL.,

                                 :

              *Defendant-Intervenors*.

[Granting in part and denying in part Plaintiff's Amended Motion for Judgment on the Agency Record]

Dated:  August 30, 2013

    <u>Adam H. Gordon</u>, Wiley Rein LLP, of Washington, D.C., argued for Plaintiff.  With him on the brief was <u>Robert E. DeFrancesco, III</u>.

    <u>Carrie Dunsmore</u>, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant.  With her on the brief were <u>Tony West</u>, Assistant Attorney General, Civil Division, and <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director, Commercial Litigation Branch.  Of counsel on the brief was <u>Nathaniel J. Halvorson</u>, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

    <u>Ned H. Marshak</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, New York, argued for Defendant-Intervenors.  With him on the brief were <u>Bruce M. Mitchell</u> and <u>Andrew T. Schutz</u>, of New York, New York, and <u>Mark E. Pardo</u>, <u>Jeffrey O. Frank</u>, and <u>Elaine F. Wang</u>, of Washington, D.C.

# OPINION

RIDGWAY, Judge:

In this action, the Plaintiff domestic producer of steel nails Mid Continent Nail Corporation ("Mid Continent") contests the final results, as amended, of the U.S. Department of Commerce's first administrative review[1] of the antidumping duty order covering steel nails from the People's Republic of China ("PRC").  *See* Certain Steel Nails From the People's Republic of China: Final Results of the First Antidumping Duty Administrative Review, 76 Fed. Reg. 16,379 (March 23, 2011) ("Final Results"); Certain Steel Nails From the People's Republic of China: Amended Final Results of the First Antidumping Duty Administrative Review, 76 Fed. Reg. 23,279 (April 26, 2011) ("Amended Final Results").[2]

---

[1] The period of review for this first administrative review is January 23, 2008 to July 31, 2009. *See* Issues and Decision Memorandum for the Final Results of the First Antidumping Duty Administrative Review (March 14, 2011) (Pub. Doc. No. 381) ("Issues & Decision Memorandum") at 2.

[2] Because business proprietary information was submitted in the course of the administrative review, there are two versions of the administrative record – a public version and a confidential version.  The public version of the record consists of copies of all documents in the record of this action, with confidential information redacted.  The confidential version consists of complete, unredacted copies of only those documents that include confidential information.

Documents in the public version of the administrative record are numbered sequentially, and are cited herein as "Pub. Doc. No. _____."  Documents in the confidential version of the administrative record are also numbered sequentially, but differently from the public version. Documents in the confidential version of the administrative record are cited as "Conf. Doc. No.

Pending before the court is Mid Continent's Amended Motion for Judgment on the Agency Record. Mid Continent contests two aspects of Commerce's Final Results – specifically, Commerce's selection of mandatory respondents for individual review, and Commerce's treatment of certain entries of merchandise that were initially wrongly attributed to one particular company. *See generally* Amended Memorandum in Support of Mid Continent Nail Corporation's Rule 56.2 Amended Motion for Judgment on the Agency Record ("Pl.'s Brief"); Reply Brief of Mid Continent Nail Corporation ("Pl.'s Reply Brief").[3]

The Government as well as the Defendant-Intervenors – comprising a total of 15 producers, exporters, and importers of steel nails subject to the antidumping duty order – maintain that Mid Continent's claims are baseless and that the Final Results should be sustained. *See generally* Defendant's Memorandum in Opposition to Plaintiff's Rule 56.2 Motion for Judgment Upon the

_____."

Mid Continent and Defendant-Intervenors filed both public and confidential versions of all briefs. Citations to briefs are to the public versions whenever possible, and except as specified. Citations to the confidential version of a brief are prefaced with "Conf."

[3]Seven of the 10 counts in the Complaint that Mid Continent filed in this action (Court No. 11-00119) were consolidated into Court No. 11-00102 (now Consol. Court No. 11-00102) – a companion case contesting the same final results which was commenced by The Stanley Works (Langfang) Fastening Systems Co., Ltd. and The Stanley Works/Stanley Fastening Systems. *See* Order (Sept. 16, 2011). Of the three remaining counts set forth in its Complaint in this action, Mid Continent has briefed only two – Count I (challenging Commerce's selection of mandatory respondents) and Count V (challenging the agency's determination concerning the liquidation of certain entries of merchandise that were entered using another company's exporter-producer specific combination rate). Mid Continent has elected not to pursue Count VI, which alleged that Commerce improperly included in the review three respondents that were not mandatory respondents and had not requested review. *See* Pl.'s Brief at 1 n.2.

Agency Record ("Def.'s Brief"); Defendant-Intervenors' Memorandum in Opposition to Plaintiff's

Rule 56.2 Motion for Judgment on the Agency Record ("Def.-Ints.' Brief").[4]

Jurisdiction lies under 28 U.S.C. § 1581(c) (2006).[5]  As detailed below, Mid Continent's

Amended Motion for Judgment on the Agency Record must be granted in part and denied in part.

## I. <u>Background</u>

In this action, Mid Continent mounts two attacks on the Final Results in the first

administrative review of the antidumping duty order on steel nails from the PRC.  First, Mid

Continent challenges Commerce's selection of two respondents for individual examination.  *See*

*generally* Pl.'s Brief at 1, 6-10, 15; Pl.'s Reply Brief at 1-9.  And, second, Mid Continent contests

Commerce's determination concerning the liquidation instructions issued to the Bureau of Customs

and Border Protection ("Customs") for certain entries of merchandise that were initially attributed

to Certified Products International Inc. ("CPI").  *See generally* Pl.'s Brief at 1-2, 13-15; Pl.'s Reply

Brief at 9-15.  The relevant facts are summarized below.

---

[4]The 15 Defendant-Intervenors are Itochu Building Products Co., Inc., Certified Products International Inc. ("CPI"), Chiieh Yung Metal Ind. Corp., Huanghua Jinhai Hardware Products Co., Ltd., Tianjin Jinghai County Hongli Industry & Business Co., Ltd., Tianjin Jinchi Metal Products Co., Ltd., Shandong Dinglong Import & Export Co., Ltd., Tianjin Zhonglian Metals Ware Co., Ltd., Hengshui Mingyao Hardware & Mesh Products Co., Ltd., Huanghua Xionghua Hardware Products Co., Ltd., Wintime Import & Export Corporation Limited of Zhongshan, Shanghai Jade Shuttle Hardware Tools Co., Ltd., Romp (Tianjin) Hardware Co., Ltd., China Staple Enterprise (Tianjin) Co., Ltd., and Qidong Liang Chyuan Metal Industry Co., Ltd.

[5]All citations to federal statutes are to the 2006 edition of the United States Code.  Similarly, all citations to federal regulations are to the 2008 edition of the Code of Federal Regulations.

A.  Commerce's Selection of Respondents for Individual Review

In an antidumping administrative review, Commerce generally is required to establish an individual dumping margin for "each known exporter and producer of the subject merchandise." 19 U.S.C. § 1677f-1(c)(1).  However, when a review involves a "large number" of exporters and producers, the statute authorizes Commerce to limit its determination of individual dumping margins to a "reasonable number" of exporters or producers, which are referred to as "mandatory respondents." *See* 19 U.S.C. § 1677f-1(c)(2); Antidumping Manual, Chap. 10 at 6 (Dep't Commerce Oct. 13, 2009) ("AD Manual").

The dumping margins for respondents that qualify for a separate rate but are not subject to individual examination are based on the weighted average of the mandatory respondents' dumping margins, excluding rates that are zero, *de minimis*, or based entirely on adverse facts available.  AD Manual, Chap. 10 at 7.  Companies subject to a review that do not respond to Commerce's requests for information are considered to be part of the "non-market economy-wide entity" ("NME-wide entity") and are assigned the "NME-wide rate." *Id.*[6]

The first issue in this action is whether Commerce's decision to limit the number of

---

[6]Because this administrative review involved a non-market economy ("NME"), the People's Republic of China, Commerce began "with a rebuttable presumption that all companies within the country are subject to government control and thus should be assessed a single antidumping duty rate."  Certain Steel Nails From the People's Republic of China: Notice of Preliminary Results and Preliminary Rescission, in Part, of the Antidumping Duty Administrative Review, 75 Fed. Reg. 56,070, 56,073 (Sept. 15, 2013).  Typically, to obtain a "separate rate," exporters must demonstrate independence through absence of both *de jure* and *de facto* government control over export activities.  *Id.*, 75 Fed. Reg. at 56,073.  However, The Stanley Works (Langfang) Fastening Systems Co., Ltd. fell within an exception for wholly foreign-owned companies and was preliminarily granted a separate rate.  *Id.*, 75 Fed. Reg. at 56,073.

mandatory respondents to two was lawful.  Shortly after the administrative review in question was

initiated, Commerce signaled its intent – in light of the large number of exporters and producers

involved in the review – to use U.S. import data from Customs to select a limited number of

respondents for individual review; and Commerce invited comments on that proposal.  Mandatory

Respondent Selection Notice at 1 (Pub. Doc. No. 26).  In its first comments on respondent selection,

Mid Continent stated that "analysis of the [customs] data indicates that [*Commerce*] *reasonably*

*should determine to limit the number of respondents in this review to two*."  Mid Continent First

Comments on Respondent Selection at 3 (Pub. Doc. No. 35) (emphasis added).  Mid Continent

emphasized that "[*n*]*either the statute nor the regulations set*[*s*] *a minimum or limit on the number*

*of respondents . . . , or the volume of imports that should be covered*," opining that "those numbers

will depend on a variety of factors, including the number of producers . . . included in the review,

the nature of the business operations, and the types of products that the respondents produce."  *Id*.

(emphasis added).

     Mid Continent specifically urged Commerce to select Stanley and CPI as the two mandatory

respondents for individual review.  Mid Continent First Comments on Respondent Selection at 4.

Mid Continent stated that, among other things, Stanley and CPI would "provide a representative

sample of respondent types," because CPI sourced subject merchandise from multiple Chinese

producers.  *Id*.

     In making its respondent selection decision, Commerce determined that, in light of the fact

that review had been requested as to 159 exporters and producers, and given the agency's resource

constraints, it simply was not practicable to calculate individual margins for all respondents.  *See*

First Respondent Selection Memorandum at 2-3 (Pub. Doc. No. 123).  Instead, relying on customs

data, Commerce selected as mandatory respondents the two largest exporters by volume for the

relevant period – specifically, Stanley and CPI, the two respondents that Mid Continent had

advocated.  *See id*. at 5; 19 U.S.C. § 1677f-1(c)(2)(B).

From the first days of the review, CPI had argued to Commerce that it should not be selected

as a mandatory respondent, because it had no shipments to the United States during the period of

review.  *See* CPI Comments on Respondent Selection at 2-5 (Conf. Doc. No. 17).  In the First

Respondent Selection Memorandum, Commerce advised that, "if CPI claims it had no shipments

during this [period of review], [Commerce] will consider it a no shipment respondent and then select

another respondent."  First Respondent Selection Memorandum at 5.  Commerce subsequently

deselected CPI as a mandatory respondent in light of its claim of no shipments (*see* CPI "No

Shipment" Letter at 2-3 (Pub. Doc. No. 124)), and replaced CPI with Tianjin Xiantong Material &

Trade Co., Ltd., which, together with Stanley, "account[ed] for the largest volume of exports that

[could] be reasonably examined."  *See* Second Respondent Selection Memorandum at 2-3 (Pub. Doc.

No. 142).

In response to Commerce's decision to replace CPI with one additional respondent, Mid

Continent submitted comments, in which it argued, among other things, that Commerce should

"select as mandatory respondents no fewer than five and up to eight of the largest exporters

identified by the [customs] data."  Mid Continent Additional Comments on Respondent Selection

at 11 (Conf. Doc. No. 66).  One month later, when Tianjin Xiantong refused to participate in the

administrative review, Mid Continent urged Commerce to select the next three largest exporters by

export volume as mandatory respondents.  Mid Continent Supplemental Comments on Respondent

Selection at 2 (Conf. Doc. No. 74).  Commerce replaced Tianjin Xiantong with Shandong Minmetal

Co., Ltd., the next largest exporter by volume.  *See* Third Respondent Selection Memorandum at 2

(Pub. Doc. No. 175).

Commerce thereafter issued its Preliminary Results, reflecting dumping margins of 6.48%

for Stanley and 51.25% for Shandong Minmetal.  *See* Certain Steel Nails From the People's

Republic of China: Notice of Preliminary Results and Preliminary Rescission, in Part, of the

Antidumping Duty Administrative Review, 75 Fed. Reg. 56,070, 56,077 (Sept. 15, 2010)

("Preliminary Results").  In addition, Commerce assigned dumping margins of 13.31% to the 24

"separate rate respondents" who were not individually reviewed based on the weighted average of

the publicly available U.S. sales values for Stanley and Shandong Minmetal.  *See id.*, 75 Fed. Reg.

at 56,074, 56,077.  Eighty-two companies for which a review was requested did not apply for

separate rate status and were thus assessed at the PRC-wide rate of 118.04%.  *Id.*, 75 Fed. Reg. at

56,074-75.

After the Preliminary Results were released, Mid Continent filed an administrative case brief

with Commerce, contesting various aspects of the agency's analysis.  *See generally* Mid Continent

Case Brief (Pub. Doc. No. 337).  In general, when a party files an administrative case brief, that

submission must address all of the party's objections, even those arguments that the party "presented

before the . . . preliminary results," in order to preserve an issue for further consideration.  *See* 19

C.F.R. § 351.309(c)(2).  However, although Mid Continent had previously voiced concerns about

Commerce's respondent selection process and although its positions on respondent selection had

changed over time, Mid Continent's administrative case brief was silent on the issue.  *See* Mid Continent Case Brief.

After the Preliminary Results were released but before the Final Results issued, Shandong Minmetal ceased its participation in the administrative review.  *See* Final Results, 76 Fed. Reg. at 16,380.  As a result, Stanley became the sole mandatory respondent for the Final Results, and the weighted average margins of the separate rate respondents were adjusted to 13.90%, Stanley's rate. *See id.*, 76 Fed. Reg. at 16,381-82.  The Amended Final Results, which accounted for a ministerial error in Commerce's calculation of Stanley's margin, further adjusted the dumping margins of Stanley and the separate rate respondents downward from 13.90% to 10.63%.  *See* Amended Final Results, 76 Fed. Reg. at 23,280.

The Issues & Decision Memorandum that accompanied the Final Results did not address Commerce's selection of mandatory respondents, because Mid Continent's administrative case brief, filed with the agency after issuance of the Preliminary Results, had not raised the issue.  *See* Issues and Decision Memorandum for the Final Results of the First Antidumping Duty Administrative Review (March 14, 2011) (Pub. Doc. No. 381) ("Issues & Decision Memorandum").

B.  Commerce's Treatment of Entries Initially Mis-Attributed to CPI

In non-market economy ("NME") investigations and administrative reviews, Commerce "begins with a rebuttable presumption that all companies within the country are essentially operating units of a single, government-wide entity and, thus, should receive a single antidumping duty rate (*i.e.*, an NME-wide rate)."  AD Manual, Chap. 10 at 3.  If an exporter can establish that it is separate

from the government-wide entity, it may obtain a "separate rate." *Id*.; *see also* n.6, *supra* (explaining how exporters establish that they qualify for separate rate). All separate rates assigned in NME investigations are specific to an exporter, and to the producer that supplied the exporter during the period of investigation. These rates are called "combination rates." *See* Import Administration Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries (2005) ("Policy Bulletin 05.1") at 6-7. Commerce uses these exporter-producer-specific "combination rates" as a tool to prevent companies from "funneling" subject merchandise through exporters with the lowest rates. *See id*. at 6-7.

The second issue presented in this action concerns Commerce's rejection of Mid Continent's request that Commerce impose the PRC-wide rate, 118.04% – the highest rate in this review – on certain companies that entered goods under the combination rates assigned to CPI, one of the defendant-intervenors in this case. CPI (discussed in section I.A, above) is a Taiwan-based company that does not produce nails, but, instead, purchases them from various unaffiliated producers in mainland China and resells them to customers in the United States. *See* CPI "No Shipment" Letter at Exh. 1.

In the antidumping investigation that preceded this administrative review, Commerce assigned exporter-producer-specific combination rates to CPI as an exporter with respect to 29 different Chinese producers. *See* Notice of Antidumping Duty Order: Certain Steel Nails From the People's Republic of China, 73 Fed. Reg. 44,961, 44,963-64 (Aug. 1, 2008) ("Antidumping Order") (listing CPI's various combination rates). The combination rate for each such exporter-producer pair was 21.24%. *See id*., 73 Fed. Reg. at 44,963-64.

During the period of review, 23 of CPI's unique combination rate codes from the investigation were used by importers to enter subject merchandise into the United States. *See* Issues & Decision Memorandum at 24.  However, as discussed above, shortly after the administrative review began, CPI explained to Commerce that it had not *exported* any subject merchandise during the period of review and thus should not be considered the exporter of the entries that customs data attributed to CPI.  *See generally* CPI "No Shipment" Letter at 2-3; section I.A, *supra*.[7]  On the other hand, CPI acknowledged purchasing nails for *resale* (but not for export) from many of the 23 unaffiliated producers that had entered goods into the U.S. using CPI's combination rates during the period of review.  *See* CPI Comments on Respondent Selection at 2-5.[8]

_____

[7]Under the "knowledge test," if a producer knows or has reason to know at the time of sale that goods sold to a reseller are destined for export to the United States, the producer – not the reseller – is considered to be the exporter.  *See* Trade Agreements Act of 1979, Statements of Administrative Action, H.R. Doc. No. 96-153, Part II at 411 (1979), *reprinted in* 1979 U.S.C.C.A.N. 665, 682.

CPI's "No Shipment" Letter confirmed that the company is a "Taiwanese reseller of nails made in China [and] subject to an antidumping duty order, and that during the [period of review], 1/23/08-7/31/09, all of its sales, shipments and entries of subject merchandise into the United States consisted of merchandise which CPI purchased from unaffiliated vendors in China who had actual knowledge that the goods were destined for the United States prior to time of sale to CPI.  Thus, during the [period of review], CPI had no shipments, sales or entries to the United States of subject merchandise, since CPI was not the exporter of subject merchandise, as the term exporter is defined by [Commerce]."  CPI "No Shipment" Letter at Exh. 1.

[8]Imports from 13 of the 23 producers comprised [[     ]] of all imports that were entered at CPI's cash deposit rate.  *See* CPI Comments on Respondent Selection at Exh. 2.  Imports associated with the other 10 CPI combination rates accounted for all of the remaining imports attributed to CPI during the period of review.  *See id*.  CPI "reconfirmed that its exports during [the period of review] were limited to subject nails purchased from 13 vendors."  *Id*. at Exh. 7 (entitled "Red Herring No. 3").

Commerce's "no shipment" review of CPI involved extensive investigation.  In determining

that CPI made no shipments, Commerce concluded that the entries that were initially attributed to

CPI resulted from other companies entering merchandise under CPI's combination rates.  Partial

Rescission Memorandum at 3-5 (Conf. Doc. No. 129).  CPI acknowledged that it had sourced nails

from 13 of the 23 companies that had entered subject merchandise under CPI's combination rates

during the period of review, and that those producers had knowledge that the goods sold to CPI were

destined for the United States.  *Id*. at 4.  CPI also provided sample sales trace packages for the 13

companies.  *Id*.

Commerce concluded that, where companies had knowledge that goods sold to CPI were

destined for the United States, those companies (rather than CPI) would be considered the actual

exporters, and CPI would be considered a reseller.  Partial Rescission Memorandum at 3-4.

Commerce confirmed with Customs that CPI itself had not made any relevant shipments, and then

obtained from Customs entry packages for each of the 23 companies whose Customs case number

related to CPI.  *See id*. at 4, Att. 4.

Commerce determined that entries from 13 of the companies accounted for "the vast

majority of the entries attributed to CPI" and that the 13 companies – and not CPI – should be

considered the exporters.  Partial Rescission Memorandum at 4.  Commerce further determined that

the combination rates shared by CPI and the other 10 companies "account for a minuscule percentage

of the entries," and indicated that those errors were explained as "coding errors upon entry or

differences in timing."  *Id*.  After reviewing Customs entry packages for the remaining 10 companies,

Commerce concluded that "examination of the entry documents demonstrates that they did not

pertain to the combination under which they were entered," and that they were therefore not attributable to CPI.  *Id.*

In its Preliminary Results, Commerce announced that – after investigating CPI's claim that it had no shipments to the United States during the period of review – the agency was preliminarily rescinding the administrative review with respect to CPI.  *See* Preliminary Results, 75 Fed. Reg. at 56,071.[9]  In the administrative case brief that Mid Continent filed with Commerce following issuance of the Preliminary Results, Mid Continent challenged the various companies' use of CPI's combination rates.  Mid Continent Case Brief at 11-16.  Mid Continent argued that "exporters deliberately used CPI's combination [rates] to take advantage of [CPI's] cash deposit rate," and asserted that Commerce should address "this type of exporter fraud" by instructing Customs to apply the highest rate in the proceeding – the PRC-wide rate – to steel nails exported by those companies using CPI's combination rates.  *Id.*  at 14-15.

In its Issues & Decision Memorandum supporting the Final Results, Commerce explained that – as to the 23 companies with entries that were initially mis-attributed to CPI – the agency would instruct Customs to liquidate the entries at issue depending on whether the company was one of the 13 companies that had knowledge that its goods were destined for the United States or one of the 10 companies for which no record evidence demonstrated a connection to CPI.  Issues & Decision Memorandum at 24-25.  For the 13 companies that had knowledge that goods sold to CPI were

---

[9]Ultimately, based on the submissions of CPI and its unaffiliated producers, Commerce removed CPI as a mandatory respondent and rescinded the agency's review with respect to CPI.  *See* Second Respondent Selection Memorandum at 2-3; Final Results, 76 Fed. Reg. at 16,380.

destined for the United States, Commerce stated that it would instruct Customs to liquidate entries at "the separate rate they earned either in the [underlying antidumping] investigation or in this review, as applicable." *See id*. at 24.  For the 10 companies with entries that were initially mis-attributed to CPI but did not appear to be connected to CPI, Commerce indicated that it would instruct Customs to "assess [antidumping] duties at the rate in effect at the time of entry." *See id*. at 25.  In addition, noting that "record evidence" indicated that "some entries may have been classified under the incorrect combination rate," Commerce advised that it was referring the matter to Customs for consideration of possible enforcement action. *See id*.

    This action followed.

## II. <u>Standard of Review</u>

    In an action reviewing an antidumping determination by Commerce, the agency's determination must be upheld except to the extent that it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also* <u>NMB Singapore Ltd. v. United States</u>, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Universal Camera Corp. v. Nat'l Labor Relations Bd.</u>, 340 U.S. 474, 477 (1951) (*quoting* <u>Consol. Edison Co. v. Nat'l Labor Relations Bd.</u>, 305 U.S. 197, 229 (1938)); *see also* <u>Mittal Steel Point Lisas Ltd. v. United States</u>, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (same).  Moreover, any evaluation of the substantiality of evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence

or evidence from which conflicting inferences could be drawn." <u>Suramerica de Aleaciones</u>
<u>Laminadas, C.A. v. United States</u>, 44 F.3d 978, 985 (Fed. Cir. 1994) (*quoting* <u>Universal Camera</u>
<u>Corp.</u>, 340 U.S. at 487-88); *see also* <u>Mittal Steel</u>, 548 F.3d at 1380-81 (same).  That said, the mere
fact that it may be possible to draw two inconsistent conclusions from the record does not prevent
Commerce's determination from being supported by substantial evidence.  <u>Am. Silicon Techs. v.</u>
<u>United States</u>, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also* <u>Consolo v. Federal Maritime Comm'n</u>,
383 U.S. 607, 620 (1966).

      While Commerce must explain the bases for its decisions, "its explanations do not have to
be perfect." <u>NMB Singapore</u>, 557 F.3d at 1319.  Nevertheless, "the path of Commerce's decision
must be reasonably discernable," to support judicial review.  *Id*. (*citing* <u>Motor Vehicle Mfrs. Ass'n</u>
<u>v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983)); *see generally* 19 U.S.C. § 1677f(i)(3)(A)
(requiring Commerce to "include in a final determination . . . an explanation of the basis for its
determination").

      Finally, under the familiar <u>Chevron</u> framework, Commerce's statutory interpretation is
reviewed using a two step analysis, first examining "whether Congress has directly spoken to the
precise question at issue." <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467
U.S. 837, 842 (1984).  If so, courts must "give effect to the unambiguously expressed intent of
Congress." <u>Household Credit Servs. v. Pfennig</u>, 541 U.S. 232, 239 (2004) (*citing* <u>Chevron</u>, 467 U.S.
at 842-43).  If instead Congress has left a "gap" for Commerce to fill, the agency's interpretation is
"given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute."
<u>Chevron</u>, 467 U.S. at 843-44; *see also* <u>Household Credit</u>, 541 U.S. at 239.

As a rule, courts afford "great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16 (1965).  The agency's construction need not be the only reasonable one or the result that the court would have reached had the question first arisen in a judicial proceeding.  *Id*. (*citing* Unemployment Comp. Comm'n of Alaska v. Aragon, 329 U.S. 143, 153 (1946)).  Courts thus are not to "weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992) (*citing* Chevron, 467 U.S. at 866).

### III.  Analysis

Mid Continent first contends that Commerce's decision to limit its individual review to two respondents contravened the statute.  In addition, Mid Continent disputes Commerce's determinations concerning the treatment of the entries that were initially attributed to CPI.

For the reasons set forth in the analysis that follows, Mid Continent's challenge to Commerce's selection of respondents is unavailing.  *See* section III.A, *infra*.  However, one of Mid Continent's arguments on the second issue raises concerns that warrant remand.  *See* section III.B, *infra*.

### A.  Commerce's Selection of Respondents for Individual Review

As a threshold matter, Defendant-Intervenors point out that Mid Continent failed to exhaust its administrative remedies as to Commerce's respondent selection process.  Defendant-Intervenors

assert that Mid Continent therefore is not entitled to press its respondent selection claim here. *See generally* Def.-Ints.' Brief at 2-3, 28-31.  Mid Continent contends that it was not required to exhaust its remedies under the circumstances of this case. *See generally* Pl.'s Reply Brief at 5-9.

On the merits, Mid Continent argues that Commerce was obligated by statute to conduct individual reviews of more than two companies, and that the agency erred in not selecting additional respondents for individual review. *See generally* Pl.'s Brief at 1, 6-10, 15; Pl.'s Reply Brief at 1-5. For their part, the Government and Defendant-Intervenors defend Commerce's respondent selection determinations, maintaining that they were in all respects supported by substantial evidence and otherwise in accordance with law. *See generally* Def.'s Brief at 7, 9-12, 18; Def.-Ints.' Brief at 2-3, 20-28, 39.

As detailed below, Mid Continent's failure to exhaust its administrative remedies is fatal to its respondent selection claim.  However, even if Mid Continent's respondent selection claim were to be considered on its merits, Mid Continent nevertheless would not prevail.

### 1. Exhaustion of Administrative Remedies

Commerce's regulations authorize a party that is dissatisfied with the preliminary results in a proceeding to file an administrative case brief, which "must present all arguments that continue in the submitter's view to be relevant" to a final determination by the agency, including "any arguments presented before the date of publication of the . . . preliminary results." *See* 19 C.F.R. §

351.309(c)(1)-(2).[10]  Emphasizing that Mid Continent did not object to any aspect of Commerce's

-------------------

[10]As the Court of Appeals recently observed, Commerce's regulations do not expressly "impose [on all parties in an international trade proceeding] duties to file" administrative case briefs with the agency.  *See* Itochu Building Prods. v. United States, ____ F.3d ____, ____ n.1, 2013 WL 4405863 * 4 n.1 (Fed. Cir. 2013) (discussing 19 C.F.R. § 351.309).  However, it is well-established that the parties' filing of administrative case briefs fulfills a critical function for other parties, the agency, and even the courts, in light of the highly complex and extremely time-compressed nature of such proceedings.  Thus, while no party is *required* to file an administrative case brief (certainly not if the party has no objections to voice), and without regard to any imperfections in the language of the existing regulations, it is generally understood (and longstanding, accepted practice) in the field that a party wishing to preserve an issue for Commerce's further consideration in the Final Results (as well as for potential future litigation) generally must raise that issue in the party's administrative case brief filed following issuance of the Preliminary Results.  Issues that are not addressed in an administrative case brief filed with the agency are generally deemed abandoned.

In any event, as Itochu acknowledges, 19 C.F.R. § 351.309 clearly applies in administrative review proceedings (such as the administrative review at issue in this action); and – on its face – the regulation requires that, if a party files an administrative case brief (as Mid Continent did here), that case brief "must include all arguments the submitter believes remain pertinent."  *See* Itochu, ____ F.3d at ____ n.1, 2013 WL 4405863 * 4 n.1 (discussing 19 C.F.R. § 351.309(b)(1) & (c)(2)).  Indeed, as noted above, Commerce's regulations expressly require that a party's administrative case brief include even those arguments that the party "presented before the . . . preliminary results," in order to preserve an issue for further consideration.  *See* 19 C.F.R. § 351.309(c)(2).  It is therefore of no moment that Mid Continent raised concerns about respondent selection in various submissions prior to Commerce's issuance of the Preliminary Results.  *See* Pl.'s Brief at 3-4, 6-7 (summarizing various Mid Continent submissions concerning respondent selection); Pl.'s Reply Brief at 3, 6, 7-8 (same); Def.-Ints.' Brief at 4, 9-11, 29-31 (same).  Under the agency's regulations, any such prior submissions could not excuse Mid Continent from the requirement to present its concerns in its administrative case brief.

In fact, as Defendant-Intervenors observe, Mid Continent took inconsistent positions on respondent selection over the course of the administrative review, making it all the more critical that Mid Continent definitively articulate in detail its position and its supporting arguments on respondent selection – once and for all – in the administrative case brief that it filed with Commerce.  *See* Def.-Ints.' Brief at 2-3, 30-31.  Under the circumstances, Commerce had, as a practical matter, little or "no way of understanding the basis for [Mid Continent's] claim unless [Mid Continent] filed a Case Brief with [Commerce] discussing the respondent selection issue."  *Id*. at 31.  These facts, among others, serve to distinguish this case from Itochu.  *Compare* Itochu, ____ F.3d at ____, ____, 2013 WL 4405863 * 5, 7 (emphasizing that, given the specific, "rare" circumstances of that case,

---

"no purpose was served by requiring Itochu to have resubmitted its . . . argument after Commerce announced the preliminary results"). Similarly, in <u>Itochu</u>, "a concrete interest in prompt judicial review [was] impaired by requiring Itochu's resubmission of earlier comments." *Id.*, ____ F.3d at ____, 2013 WL 4405863 * 6. In contrast, there was no apparent reason for Mid Continent not to continue to press its objections to the respondent selection process in its administrative case brief. Certainly Mid Continent has cited no such reason. *See* Pl.'s Reply Brief at 5-9 (responding to argument that it failed to exhaust its administrative remedies by not pursuing its respondent selection arguments in its case brief, and identifying no negative consequences that might have flowed from doing so); *see also*, *e.g.*, <u>Asahi Seiko Co. v. United States</u>, 35 CIT ____, ____, 755 F. Supp. 2d 1316, 1327 (2011) (emphasizing that party reiterated its respondent selection objections in its administrative case brief filed in nineteenth administrative review of antidumping duty orders on ball bearings from a number of countries, even though those objections had already been asserted "in response to [Commerce's] solicitation of comments on the issue"); <u>Asahi Seiko Co. v. United States</u>, 34 CIT ____, ____, 751 F. Supp. 2d 1335, 1341 (2010) (same, in eighteenth administrative review of same antidumping duty orders); <u>Zhejiang Native Produce & Animal By-Products Import & Export Corp. v. United States</u>, 33 CIT 1125, 1127, 637 F. Supp. 2d 1260, 1262 (2009) (same, in fifth administrative review of antidumping duty order on honey from PRC).

As in <u>Corus Staal</u>, Commerce's position on Mid Continent's respondent selection concerns here turned on administrative and policy considerations (not some perceived statutory mandate), and, as in <u>Corus Staal</u>, Mid Continent here "could and should have tried to make a more comprehensive argument to Commerce regarding how to exercise [its] discretion." *See* <u>Itochu</u>, ____ F.3d at ____, 2013 WL 4405863 * 6 (discussing <u>Corus Staal BV v. United States</u>, 502 F.3d 1370, 1380 (Fed. Cir. 2007)); *see also* section III.A.2, *infra* (noting that, if Mid Continent had pressed its respondent selection claims in its administrative case brief, and particularly if it had highlighted the inherent issues of statutory construction and more clearly articulated its "representativeness" argument, Commerce would have addressed those issues in its Final Results, and might well have more clearly and specifically addressed Mid Continent's points, significantly aiding judicial review – even assuming that including Mid Continent's respondent selection claims in its case brief would not have resulted in Commerce's selection of additional respondents for individual review, the specific relief that Mid Continent sought). Further, if Mid Continent had pressed its respondent selection claims in its administrative case brief (and particularly if Mid Continent had taken the opportunity to clarify for the record any seeming inconsistencies in its position as it evolved over time, and if Mid Continent had taken the opportunity to elaborate on and amplify its arguments), Defendant-Intervenors would have had an opportunity to respond to Mid Continent's points in their rebuttal brief filed with the agency (*see* Transcript of Oral Argument at 136) – and Commerce would have had the benefit of that input as well in preparing the Final Results. And Defendant-Intervenors' rebuttal brief might well have aided judicial review (whether or not it was of any assistance to Commerce, and even if it had no effect on the Final Results). However, because Mid Continent

respondent selection determinations in the administrative case brief that Mid Continent filed in the

course of the administrative review, Defendant-Intervenors argue that the doctrine of exhaustion of

administrative remedies bars Mid Continent from raising any such objection now.  *See generally*

Def.-Ints.' Brief at 2-3, 16, 28-31.

     The doctrine of exhaustion holds generally that "no one is entitled to judicial relief for a

supposed or threatened injury until the prescribed administrative remedy has been exhausted."

Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir. 1998) (*quoting* McKart v. United

States, 395 U.S. 185, 193 (1969)) (internal quotation marks omitted).  It is thus a well-settled

principle of administrative law that "[a] reviewing court usurps the agency's function when it sets

aside [an agency] determination upon a ground not theretofore presented and deprives the [agency]

of an opportunity to consider the matter, make its ruling, and state the reasons for its action."

Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 155 (1946); *see*, *e.g.*,

Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

     "[T]he prescribed administrative remedy for challenging aspects of the preliminary results

with which a party disagrees" is for the party to set forth its objections in its administrative case brief

filed with the agency.  Corus Staal BV v. United States, 502 F.3d 1370, 1378 (Fed. Cir. 2007); *see*

*generally id.*, 502 F.3d at 1378-81 (holding, in context of administrative review, that party failed to

exhaust administrative remedies by not raising issue in administrative case brief filed with agency).

---

elected not to address respondent selection in its administrative case brief, Defendant-Intervenors
were not permitted to address the topic in their rebuttal brief.  The relatively thin administrative
record on this issue is the result.

"If a party does not exhaust available administrative remedies, 'judicial review of [Commerce's actions] is inappropriate.'" Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003) (quoting Sharp Corp. v. United States, 837 F.2d 1058, 1062 (Fed. Cir. 1988)). "'[T]he [Court of International Trade] generally takes a "strict view" of the requirement that parties exhaust their administrative remedies.'" Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1381 (Fed. Cir. 2013) (quoting Corus Staal, 502 F.3d at 1379 (citations omitted)).

        Requiring exhaustion even in a discretionary, non-jurisdictional context is sound policy, because it allows the agency to apply its expertise, to correct its own mistakes, and to compile an adequate record to support judicial review, advancing the dual purposes of protecting agency authority and promoting judicial efficiency. See Woodford v. Ngo, 548 U.S. 81, 89 (2006) (discussing two main purposes of doctrine of exhaustion, i.e., protecting "administrative agency authority" and promoting judicial economy); Itochu Building Prods. v. United States, ____ F.3d ____, ____, 2013 WL 4405863 * 4 (Fed. Cir. 2013) (same); Richey v. United States, 322 F.3d 1317, 1326 (Fed. Cir. 2003) (same). Accordingly, in actions challenging determinations in antidumping administrative reviews, the Court of International Trade requires litigants to exhaust administrative remedies "where appropriate." 28 U.S.C. § 2637(d); see also Corus Staal, 502 F.3d at 1379 (stating that 28 U.S.C. § 2637(d) "indicates a congressional intent that, absent a strong contrary reason," court should require exhaustion of administrative remedies); Itochu, ____ F.3d at ____, 2013 WL 4405863 * 4 (same, citing Corus Staal); McCarthy v. Madigan, 503 U.S. 140, 144 (1992) (explaining that, even "where Congress has not clearly required exhaustion, sound judicial discretion governs").

There are a handful of limited exceptions to the requirement that a party exhaust its administrative remedies.  *See*, *e.g.*, 5 J. Stein, G. Mitchell, & B. Mezines, *Administrative Law* § 49.02, at 49-47 (2012) (summarizing exceptions, including inadequacy of administrative remedy, impending irreparable harm, *ultra vires* agency action, futility, and pure legal question); Itochu, ____ F.3d at ____, ____, 2013 WL 4405863 * 4, 5 (noting that "[c]ourts have recognized several recurring circumstances in which institutional interests are not sufficiently weighty or application of the doctrine would otherwise be unjust," including situations where the "futility" and "pure question of law" exceptions apply, and where requiring exhaustion would cause harm to party).[11]  In the case at bar, much like the importer in Corus Staal, Mid Continent "has provided nothing by way of affirmative justification for its failure to raise the [respondent selection] issue in its case brief." Corus Staal, 502 F.3d at 1381.  Mid Continent nevertheless seeks refuge within the narrow confines of the exceptions for "futility" and "pure legal question."  *See generally* Pl.'s Reply Brief at 5-9.

Mid Continent strains to cast its respondent selection claim as a "pure legal question."  *See* Pl.'s Reply Brief at 5-9.  But that shoe won't fit.  Contrary to its assertions, Mid Continent's respondent selection claim has factual, as well as legal, components.  *See*, *e.g.*, Asahi Seiko Co. v. United States, 35 CIT ____, ____, 755 F. Supp. 2d 1316, 1329-30 (2011) (rejecting party's attempt

---

[11]*See also* 2 R. Pierce, *Administrative Law Treatise* §§ 15.2-15.8, 15.10 (5th ed. 2010) (summarizing doctrine of exhaustion and discussing exceptions); 4 C. Koch, *Administrative Law and Practice* § 12:22 (3d ed. 2010) (discussing exceptions); SeAH Steel Corp. v. United States, 35 CIT ____, ____, 764 F. Supp. 2d 1322, 1325-26 (2011) (summarizing exceptions); Corus Staal BV v. United States, 30 CIT 1040, 1050 n.11 (2006), *aff'd*, 502 F.3d 1370 (Fed. Cir. 2007) (same); Ta Chen Stainless Steel Pipe, Ltd. v. United States, 28 CIT 627, 645 n.18, 342 F. Supp. 2d 1191,1206 n.18 (2004) (same).

to invoke "pure legal question" exception where "[t]he actual claim . . . delves into factual issues implicating the evidence on the administrative record").  For example, Mid Continent's contention that Commerce erred in deciding that two was a sufficient number of mandatory respondents implicates the agency's reasons for selecting two respondents, which are factual in nature (including considerations such as the percentage of total period of review imports represented by the selected mandatory respondents).  *See* First Respondent Selection Memorandum at 4.  Also relevant are facts concerning whether an alternative selection of companies might have been more appropriate.  *See* Third Respondent Selection Memorandum at 2-3 (summarizing reasons for selecting a certain company and noting administrative burden).  Mid Continent's reliance on the "pure legal question" exception to the doctrine of exhaustion therefore is misplaced.

Nor can Mid Continent shoehorn itself into the "futility" exception.  *See generally* Pl.'s Reply Brief at 5-9.  As the Court of Appeals has emphasized, the futility exception – like the other exceptions to the doctrine of exhaustion – "is a narrow one."  *See* Corus Staal, 502 F.3d at 1379 (sustaining trial court's rejection of futility exception in civil action challenging final results of administrative review).  Thus, "[t]he mere fact that an adverse decision may have been likely does not excuse a party from . . . exhaust[ing] [its] administrative remedies."  *Id*.  "[E]ven if it is likely" that Commerce would have rejected Mid Continent's arguments, "it would still have been preferable, for purposes of administrative regularity and judicial efficiency, for [Mid Continent] to make its arguments in its case brief and for Commerce to give its full and final administrative response in the final results."  *Id*., 502 F.3d at 1380.

Although Mid Continent maintains that Commerce fully addressed Mid Continent's

arguments in the agency's Third Respondent Selection Memorandum, that document was not

necessarily designed to be "Commerce's last word on the matter."  *See* Pl.'s Reply Brief at 7; Corus

Staal, 502 F.3d at 1380.  If Mid Continent had addressed the issue of respondent selection in its

administrative case brief, Commerce would have provided a "full and final administrative response

[to Mid Continent's arguments] in the final results."  *Id*.  When Mid Continent failed to pursue the

issue in its administrative case brief, Commerce (and the other parties) were reasonably entitled to

assume that Mid Continent had elected to abandon the fight.  *See*, *e.g.*,  Ad Hoc Shrimp Trade Action

Comm. v. United States, 33 CIT 1906, 1919, 675 F. Supp. 2d 1287, 1300 (2009) (Wallach, J.)

(explaining that, where a party raised objections to respondent selection process earlier in a

proceeding, but then failed to raise any issue as to respondent selection in its administrative case

brief, "Commerce could reasonably have concluded that [the party] was no longer pursuing its

respondent selection challenge").[12]

        "[R]equiring [Mid Continent] to set forth its factual and legal arguments [on respondent

selection] in detail in its case brief would have had potential value either by resulting in possible

relief for [Mid Continent] *or at least providing the agency an opportunity to set forth its position in*

----

[12]This highlights yet another significant distinction between Itochu and the facts of this case.
In Itochu, Commerce's Final Results "referred to Itochu's position and again ruled on [Itochu's
claim] on the merits."  Itochu, _____ F.3d at _____, 2013 WL 4405863 * 5.  Here, the Final Results
make no mention of Mid Continent's objections to the respondent selection process, because Mid
Continent did not press those objections in its administrative case brief.  *See id*., _____ F.3d at _____,
2013 WL 4405863 * 6 (quoting and distinguishing Corus Staal from Itochu, observing that, *inter
alia*, "because Corus did not set forth its factual and legal arguments in detail before the agency,
Commerce did not have the 'opportunity to set forth its position in a manner that would facilitate
judicial review'").

*a manner that would facilitate judicial review*."  Corus Staal, 502 F.3d at 1380 (emphasis added);

*see also* Itochu, _____ F.3d at _____, 2013 WL 4405863 * 6 (same, quoting and discussing Corus

Staal).  By its silence, Mid Continent failed to properly preserve its respondent selection claim for

judicial review.  Its failure to exhaust its administrative remedies renders it unnecessary to reach the

merits of those claims.

### 2.  The Merits of Mid Continent's Respondent Selection Claim

Even if Mid Continent's challenge to Commerce's respondent selection process were not

barred by the doctrine of exhaustion, Mid Continent would lose on the merits.  The gravamen of Mid

Continent's complaint is that Commerce erred in limiting the agency's individual review in the

underlying administrative proceeding to a total of two respondents.  *See generally* Pl.'s Brief at 1,

6-10, 15; Pl.'s Reply Brief at 1-5.  *But see* Def.'s Brief at 7, 9-12, 18; and Def.-Ints.' Brief at 2-3,

20-28, 39.

As summarized above, the statute requires – as a general rule – that Commerce calculate

individual weighted average dumping margins "for each known exporter and producer" of the

merchandise at issue.  19 U.S.C. § 1677f-1(c)(1); section I.A, *supra*.  However, the statute also

carves out an exception to that general rule, which applies when – as here – it is "not practicable"

for Commerce to calculate individual margins for each known exporter or producer "because of the

large number of exporters or producers involved in the . . . review." 19 U.S.C. § 1677f-1(c)(2).  In

such cases, the statute directs Commerce to select a "reasonable number" of respondents for

individual review, by using either of two alternative methods: (1) by using a statistically valid

"sample of exporters, producers or types of products," or (2) by selecting the exporters and producers

"accounting for the largest volume of the subject merchandise . . . that can be reasonably examined."

19 U.S.C. § 1677f-1(c)(2)(A) & (B); Uruguay Round Agreements Act, Statement of Administrative

Action, H.R. Doc. No. 103-316, vol. 1 at 872-73 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040,

4200-01 ("SAA").[13]

---

[13]In its entirety, 19 U.S.C. § 1677f-1(c) provides:

(1) General rule. In determining weighted average dumping margins under section 734(d), 735(c), or 751(a) [*i.e.*, § 1673b(d), 1673d(c), or 1675a(a)], [Commerce] shall determine the individual weighted average dumping margin for each known exporter or producer of the subject merchandise.

(2) Exception.  If it is *not practicable* to make individual weighted average dumping margin determinations under paragraph (1) ["General rule"] because of the *large number* of exporters or producers involved in the investigation or review, [Commerce] may determine the weighted average dumping margins for a *reasonable number* of exporters or producers by limiting its examination to –

> (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to [Commerce] at the time of selection, or
>
> (B) exporters and producers *accounting for the largest volume of the subject merchandise* from the exporting country that can be *reasonably* examined.

19 U.S.C. § 1677f-1(c) (emphases added).

The Statement of Administrative Action ("SAA") acknowledges that, "[a]s a practical matter . . . . Commerce may not be able to examine all exporters and producers, for example, when there is a large number of exporters and producers," and explains that, "[i]n such situations, Commerce either limits its examination to those firms accounting for the largest volume of exports to the United States or employs sampling techniques."  *See* SAA, H.R. Doc. No. 103-316, vol. 1 at 872, *reprinted in* 1994 U.S.C.C.A.N. at 4200.  The SAA notes that there was opposition to allowing regulatory authorities such as Commerce to conduct individual reviews of limited numbers of companies: "During the Uruguay Round negotiations, certain countries sought a requirement that national

Distilled to its essence, Mid Continent's claim is that, in a series of three cases – <u>Zhejiang</u>,

<u>Carpenter</u>, and <u>Schaeffler</u> – the Court of International Trade has in effect established a "floor" on

the number of respondents to be individually reviewed, such that (according to Mid Continent)

authorities examine *all* firms producing or exporting a product subject to an antidumping investigation." *Id.*, H.R. Doc. No. 103-316, vol. 1 at 872, *reprinted in* 1994 U.S.C.C.A.N. at 4200 (emphasis in the original).  However, as the SAA explains, that position did not prevail, because, among other things, it "would have made it virtually impossible for authorities to impose antidumping duties in a WTO-consistent manner in many cases."  *See id.*, H.R. Doc. No. 103-316, vol. 1 at 872, *reprinted in* 1994 U.S.C.C.A.N. at 4200.

The SAA further addresses the two statutorily-authorized methods of selecting respondents for individual review in cases where individual review of all exporters and producers is not practicable.  *See* 19 U.S.C. § 1677f-1(c)(2)(A) & (B).  Specifically, the SAA states:

> New section 777A(c)(2) [*i.e.*, 19 U.S.C. § 1677f-1(c)(2)(A) & (B)] provides that where there are large numbers of exporters, producers, importers, or products involved in an investigation, Commerce may limit its examination to: (1) a statistically valid sample of exporters, producers or types of products; or (2) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can reasonably be examined.  Consistent with the Antidumping Agreement, [19 U.S.C. § 1677f-1(c)(2)(A) & (B)] recognizes that the authority to select samples rests exclusively with Commerce, but, to the greatest extent possible, Commerce will consult with exporters and producers regarding the method to be used.

> The phrase "statistically valid sample" [for purposes of 19 U.S.C. § 1677f-1(c)(2)(A)] is intended merely to conform the language of the statute with that of the Antidumping Agreement, and is not a substantive change from the current phrase "generally recognized sampling techniques."  Commerce will employ a sampling methodology designed to give representative results based on the facts known at the time the sampling method is designed.  This important qualification recognizes that Commerce may not have the type of information needed to select the *most* representative sample at the early stages of an investigation or review when it must decide on a sampling technique.

SAA, H.R. Doc. No. 103-316, vol. 1 at 872-73, *reprinted in* 1994 U.S.C.C.A.N. at 4200-01 (emphasis in the original).

Commerce is now required to individually review "at least four to eight" respondents, "whether the

pool of respondents is eight, 10, or 159." *See* Pl.'s Brief at 9[14]; *see generally* Zhejiang Native

Produce & Animal By-Products Import & Export Corp. v. United States, 33 CIT 1125, 637 F. Supp.

2d 1260 (2009); Carpenter Tech. Corp. v. United States, 33 CIT 1721, 662 F. Supp. 2d 1337 (2009);

Schaeffler Italia S.R.L. v. United States, 35 CIT ____, 781 F. Supp. 2d 1358 (2011).   These three

cases are the linchpin of Mid Continent's respondent selection claim.  *See generally* Pl.'s Brief at

1, 6-10 (discussing three cases); Pl.'s Reply Brief at 1-3, 5 (same).  But Mid Continent misrepresents

the holdings of all three cases.

---

[14]*See also* Pl.'s Brief at 10 (asserting that "Commerce must, at the very least, select between four and eight respondents for review"); Pl.'s Reply Brief at 5 (same, *verbatim*).

As explained elsewhere herein, Zhejiang, Carpenter, and Schaeffler deal with a fundamentally different situation than that presented here.  In each of those cases, the court held that the number of "exporters or producers involved in the investigation or review" was not a "large number" within the meaning of 19 U.S.C. § 1677f-1(c)(2).  Thus, contrary to Mid Continent's assertions, those cases *cannot* stand for the proposition that where – as here – there *is* a "large number" of exporters or producers, Commerce is required to individually examine "at least four to eight" respondents, "whether the pool of respondents is eight, 10, or 159."  *See* Pl.'s Brief at 9.

Moreover, contrary to Mid Continent's claims, Zhejiang, Carpenter, and Schaeffler do not even stand for the proposition that Commerce is required to individually examine "*at least four to eight*" respondents in an investigation or administrative review that *does not* involve a "large number" of exporters or producers.  Instead, those cases stand for the proposition that, in such a case, Commerce is required to individually examine *all* respondents.  *See generally* Zhejiang, 33 CIT at 1128-31, 637 F. Supp. 2d at 1263-65; Carpenter, 33 CIT at 1725-32, 662 F. Supp. 2d at 1340-46; Schaeffler, 35 CIT at ____, 781 F. Supp. 2d at 1362-63.

Contrary to Mid Continent's implications, there is nothing whatsoever "magic" (*i.e.*, significant) about the figures "four to eight," other than the fact that those figures were relevant in light of the case-specific facts of Zhejiang, Carpenter, and Schaeffler.  The figures "four to eight" have no particular relevance even to other cases that do not involve a "large number" of exporters or producers (to say nothing of cases that do).

Contrary to Mid Continent's assertions, <u>Zhejiang</u>, <u>Carpenter</u>, and <u>Schaeffler</u> have nothing to do with the particular respondent selection issue that Mid Continent seeks to press in this case. Specifically, <u>Zhejiang</u>, <u>Carpenter</u>, and <u>Schaeffler</u> each concerned whether the number of exporters and producers in the case was sufficiently "large" to render it "not practicable" for Commerce to conduct individual reviews of all respondents.   In other words, each of those three decisions addresses whether, under the specific facts of the particular case, it was permissible for Commerce to invoke the statutory exception to the general rule requiring the agency to conduct individual reviews of all exporters and producers – an issue that is very different than the particular issue that Mid Continent seeks to raise here.  *See* 19 U.S.C. § 1677f-1(c)(2); <u>Zhejiang</u>, 33 CIT at 1128-31, 637 F. Supp. 2d at 1263-65 (rejecting Commerce's reliance on statutory exception, based on determination that four respondents is not a "large number" as that term is used in statute); <u>Carpenter</u>, 33 CIT at 1728-29, 662 F. Supp. 2d at 1343-44 (same; eight respondents is not a "large number"); <u>Schaeffler</u>, 35 CIT at _____, 781 F. Supp. 2d at 1362-63 (same; two respondents is not a "large number"); *see also* Def.'s Brief at 10-11 (emphasizing that cases cited by Mid Continent "all address . . . whether the total number of producers in a review constitute[s] a 'large number,' not whether the number of respondents selected is a 'reasonable number'"); Def.-Ints.' Brief at 24-28 (similar).[15]

_____

[15]There is thus no truth, for example, to Mid Continent's claim that "[i]n both <u>Zhejiang</u> and <u>Carpenter</u>, the Court addressed the number of respondents that must be selected for individual examination to be considered '*reasonable*.'"  *See* Pl.'s Brief at 7 (emphasis added); *compare* 19 U.S.C. § 1677f-1(c)(2) (providing that, where a review involves a "*large number*" of exporters or producers, rendering it "not practicable" to conduct individual reviews of all of them, statutory exception authorizes Commerce to limit individual reviews to a "*reasonable number*" of companies)

Simply stated, the applicability of the exception to the general rule requiring individual

_____

(emphases added).  As a matter of law, that issue simply was not presented in the cases on which Mid Continent relies.

Mid Continent also plays fast-and-loose with certain key record facts.  Thus, for example, in its opening brief, Mid Continent flatly represents that "[a]t the start of the review," Mid Continent "urged Commerce to select at least five 'mandatory' respondents."  Pl.'s Brief at 3; *see also, e.g.*, *id.* at 7 (representing that "both Mid Continent and Stanley urged Commerce to individually examine four or five (or more) Chinese exporters").  However, shortly after the review was initiated, in Mid Continent's very first submission to Commerce concerning respondent selection, Mid Continent argued to Commerce that "analysis of the [Customs] data indicates that [Commerce] reasonably should determine to *limit the number of respondents in this review to two*."  *See* Mid Continent First Comments on Respondent Selection at 3 (Pub. Doc. No. 35) (emphasis added).  In its reply brief, Mid Continent was forced to acknowledge its earlier misrepresentation.  *See* Pl.'s Reply Brief at 3 (admitting that "Defendant-Intervenors are correct that Plaintiff initially requested that Commerce select the two largest respondents, Stanley and CPI").

It bears repeating that USCIT Rule 11(b) provides that an attorney's signature on court papers certifies, among other things, that each of "the claims, defenses, and other legal contentions" therein "are warranted by existing law" (or a non-frivolous argument for the extension or modification of the law) and that all "factual contentions have evidentiary support."  USCIT Rule 11(b).  "Inherent in that certification is the assertion that *the existing law*, as well as *the facts of record*, have been stated 'accurately and correctly.'"  Diamond Sawblades Mfgrs.' Coalition v. United States, 34 CIT ____, ____, 2010 WL 517477 * 5 (2010) (emphases added) (*quoting* Precision Specialty Metals, Inc. v. United States, 315 F.3d 1346, 1356 (Fed. Cir. 2003)); *see, e.g.*, Former Employees of BMC Software, Inc. v. U.S. Sec'y of Labor, 31 CIT 1600, 1683-85 & n.108, 519 F. Supp. 2d 1291, 1364-65 & n.108 (2007).

As the Court of Appeals recently observed, "the 1993 advisory committee note explains . . . [that] this rule [*i.e.*, Rule 11(b)] 'requires litigants to "stop-and-think" before initially making legal or factual contentions.'"  Raylon, LLC v. Complus Data Innovations, Inc., 700 F.3d 1361, 1367 (Fed. Cir. 2012).  Of course, counsel must be free to zealously represent the interests of their clients.  However, that obligation must be balanced against other (sometimes competing) ethical obligations.  Thus, for example, counsel must exercise care to "properly temper[] enthusiasm for a client's cause with careful regard for the obligations of truth, candor, accuracy, and professional judgment that are expected of them as officers of the court."  Oliveri v. Thompson, 803 F.2d 1265, 1267 (2d Cir. 1986); *see also, e.g.*, Former Employees of BMC Software, Inc. v. U.S. Sec'y of Labor, 32 CIT 1032, 1034 (2008) (and authorities cited there).

review of all respondents is not in dispute in this action.  Mid Continent candidly concedes – as it

must – that 159 is, in fact, a "large number," and that it was "not practicable" for Commerce to

individually review all 159 respondents.  *See* Pl.'s Brief at 7 (confirming that Mid Continent "does

not . . . challenge" Commerce's determination not to individually review "all 159 respondents," and

thus does not dispute agency's invocation of statutory exception); 19 U.S.C. § 1677f-1(c)(2); *see*

*also*, *e.g.*, Ad Hoc Shrimp Trade Action Comm., 33 CIT at 1918, 675 F. Supp. 2d at 1299 (holding

136 to be sufficiently "large number" of companies to trigger statutory exception to general rule

requiring individual review of all respondents).  Thus, quite unlike the plaintiffs in Zhejiang,

Carpenter, and Schaeffler, Mid Continent here does not challenge Commerce's right to rely on the

statutory exception to limit the number of respondents subject to individual review in this case.

As such, the section of the statute that is the subject of analysis in Zhejiang, Carpenter, and

Schaeffler – focusing on the term "large number" – has no relevance to this case.  The three cases

on which Mid Continent predicates its argument are, in short, inapposite.  And Mid Continent's

claim that those three cases required Commerce here to individually review "four to eight"

respondents necessarily fails of its own weight.[16]

---

[16]In its briefs, Mid Continent makes several passing allusions to statements in Zhejiang, Carpenter, and Schaeffler, as well as Asahi Seiko, which criticized Commerce for – in effect – "pre-determining" the number of respondents that it would individually review and which rejected Commerce's attempts to rely on "resource constraints" to seek to avoid individual review of all respondents in the proceedings there at issue without rational determinations that each of the proceedings involved a "large number" of respondents.  *See* Pl.'s Brief at 8-9 (referring to treatment of Commerce's claims of "resource constraints" in Zhejiang and Carpenter); *id*. at 9 (arguing that, in Zhejiang, Carpenter, and Schaeffler, "Commerce pre-determined the number of respondents that it could . . . 'reasonably consider'"); Pl.'s Reply Brief at 1-2 (arguing, *inter alia*, that "[t]aken together, [Zhejiang and Carpenter] stand for the proposition that Commerce cannot severely limit

the number of respondents for individual examination based on its claimed resource constraints"); *id.* at 2 (arguing that <u>Carpenter</u> "concluded that Commerce [in that case] had effectively prejudged the number of respondents it could examine," in contravention of the statute; that <u>Asahi Seiko</u> found that Commerce "improperly pre-determined that its available resources enabled the agency to examine only three mandatory respondents out of a possible twelve"; and that "Commerce cannot pre-determine its available resources before first considering the number of respondents for individual examination").

To be sure, it is true that <u>Zhejiang</u>, <u>Carpenter</u>, and <u>Schaeffler</u>, as well as <u>Asahi Seiko</u>, rejected Commerce's respondent selection determinations in the proceedings there at issue, based on findings that the agency had improperly invoked resource constraints and/or had prejudged the number of respondents that the agency could individually review, absent a proper determination that the existence of a "large number" of respondents justified limiting the number of respondents subject to individual review. *See generally* <u>Zhejiang</u>, 33 CIT at 1128-29, 637 F. Supp. 2d at 1263-64 (rejecting agency's decision to individually review only two respondents, reasoning that four was not a "large number" of respondents, that "[t]he statute focuses solely on the practicability of determining individual dumping margins based on the large number of exporters or producers involved in the review at hand," and that "Commerce may not rely upon its workload caused by other antidumping proceedings in assessing whether the number of exporters or producers [in a particular proceeding] is 'large'"); <u>Carpenter</u>, 33 CIT at 1726-32, 662 F. Supp. 2d at 1341-46 (rejecting agency's decision to review only two out of eight total respondents, relying heavily on rationale in <u>Zhejiang</u>); <u>Schaeffler</u>, 35 CIT at ____, ____, 781 F. Supp. 2d at 1361, 1362-66 (holding that Commerce improperly relied on resource constraints in determining that agency would individually review only one out of two total respondents, but concluding that there was no remedy available where, *inter alia*, plaintiffs failed to exhaust administrative remedies by failing to pursue request for voluntary respondent status); <u>Asahi Seiko</u>, 34 CIT at ____, 751 F. Supp. 2d at 1340-45 (ruling, *inter alia*, that, where "Commerce decided that its own resources allowed it to examine individually only three mandatory respondents from a total of twelve subject to review," the agency "exceeded its statutory authority in severely limiting the number of respondents for individual examination based on its own general resource constraints," but concluding that no remedy was available because plaintiff failed to exhaust administrative remedies by withdrawing its request for review and by failing to pursue voluntary respondent status).

Yet again, however, the cases that Mid Continent cites do nothing to advance its cause, because – in each of those cases – Commerce could not show that the administrative proceeding there at issue involved a "large number" of respondents, entitling the agency to limit the number of companies selected for individual review.  In contrast, in the case at bar, there is no question but that the proceeding at issue involved a "large number" of respondents.  And no party disputes that Commerce was entitled, as a matter of law, to limit the number of companies selected for individual

Mid Continent's claim turns instead on a different part of the statute – in particular, on the language stating that, in a proceeding like that at issue here (which indisputably involved a "large number" of respondents, rendering individual review of all respondents "not practicable"), Commerce instead may identify a "reasonable number" of respondents for individual review, using either of the two methodologies specified in the statute.  19 U.S.C. § 1677f-1(c)(2)(A) & (B).  In this instance, Commerce, in exercising its statutory discretion, decided to limit individual review to those "exporters and producers accounting for the largest volume of the subject merchandise . . . that [could] be reasonably examined."  *See* 19 U.S.C. § 1677f-1(c)(2)(B); First Respondent Selection Memorandum at 1, 3, 5 (memorializing Commerce determination to limit the number of exporters/producers subject to individual review, due to, *inter alia*, "the significant number of companies requesting to be reviewed," and to select for individual review "the two largest exporters by volume").[17]   Accordingly, to prevail on the merits of its respondent selection claim, Mid

_____

review.

Moreover, in identifying companies for individual review under 19 U.S.C. § 1677f-1(c)(2)(B), Commerce here was required to select those "exporters and producers accounting for the largest volume of the subject merchandise . . . *that* [*could*] *be reasonably examined*."  *See* 19 U.S.C. § 1677f-1(c)(2)(B) (emphasis added).  Thus – on its face – the statute contemplates that, in circumstances such as these, Commerce's selection of respondents for individual review will take into account the agency's resource constraints.

[17]It appears that, historically, when limiting the number of respondents for individual review in reliance on the statutory exception in 19 U.S.C. § 1677f-1(c)(2), Commerce's typical practice has been to "select[] respondents with the largest volume" (pursuant to § 1677f-1(c)(2)(B)), as the agency did in this instance, although sampling (pursuant to § 1677f-1(c)(2)(A)) occasionally has been employed.  *See* Ad Hoc Shrimp Trade Action Comm., 33 CIT at 1917 & n.5, 675 F. Supp. 2d

Continent must establish that – in identifying companies for individual review in the underlying

proceeding by "accounting for the largest volume of the subject merchandise . . . that can be

reasonably examined" – Commerce acted unreasonably in selecting the two respondents that it did.

19 U.S.C. § 1677f-1(c)(2)(B). Zhejiang, Carpenter, and Schaeffler do not speak to that issue.[18] And

Mid Continent offers precious little by way of argument beyond its (misplaced) reliance on those

three cases.[19]

_____

at 1298-99 & n.5 (explaining, *inter alia*, that selecting respondents based on volume of imports is Commerce's "normal practice"); *see also* Proposed Methodology for Respondent Selection in Antidumping Proceedings; Request for Comment, 75 Fed. Reg. 78,678 (Dec. 16, 2010) (explaining that, "in virtually every one of its proceedings," Commerce has selected respondents for individual review based on import volume, rather than using sampling).

[18]*Cf.* Schaeffler, 35 CIT at ____, 781 F. Supp. 2d at 1362-63 (in *dicta*, offering the incontrovertible observation that "[t]he plural term '*reasonable* number of *exporters* or *producers*,' read according to its plain meaning, does not encompass a quantity of one").

[19]For the first time in its reply brief, Mid Continent appears to be attempting to formulate an argument that leverages the three cases on which it principally relies (concerning the meaning of a "large number" of respondents) and seeks to link them to the requirement that Commerce individually review a "reasonable number" of respondents in those proceedings where it is not required to conduct individual reviews of all respondents. 19 U.S.C. § 1677f-1(c)(2). Specifically, Mid Continent asserts in its reply brief that, "[w]hen the potential pool of respondents is 159 companies, Commerce cannot limit the number of individually examined companies to two, when Commerce would have been required to select between four and eight companies for individual review if the pool of potential respondents were eight to twelve." *See* Pl.'s Reply Brief at 3. According to Mid Continent, such an interpretation "would read the term 'reasonable' out of the statute." *Id.* In essence, Mid Continent belatedly endeavors to juxtapose the statutory terms "large number" and "reasonable number," and to reason that – if Commerce is required to review all four to eight respondents if the number of respondents in a case *is not* "large" – Commerce logically cannot be permitted to review *fewer* than four to eight respondents where the number of respondents *is* "large." *See id.* Mid Continent's formulation is linguistically clever, and – at first blush – has a certain superficial appeal. But the proposition does not withstand closer scrutiny.

There is no need to consider this argument in detail here. Mid Continent raised this more

Thus, for example, not only does Mid Continent seek to build its respondent selection claim on three cases that do not concern the particular respondent selection issue at stake in this action, but, in addition, Mid Continent ignores the cases that in fact *do* bear on that issue – all of which cut against Mid Continent's claim.  *See* Ad Hoc Shrimp Trade Action Comm., 33 CIT at 1917-18, 675 F. Supp. 2d at 1298-99 (sustaining Commerce's determination to limit individual review to the four respondents accounting for the largest volume of subject imports); Pakfood Public Co. v. United States, 35 CIT ____, ____, 753 F. Supp. 2d 1334, 1336-48 (analyzing and rejecting challenge to agency determination to limit individual review to the two producer/exporter entities accounting for the largest volume of subject imports), *aff'd*, 453 F. Appx. 986 (Fed. Cir. 2011); Longkou Haimeng Mach. Co. v. United States, 32 CIT 1142, 1143-57, 581 F. Supp. 2d 1344, 1347-57 (2008) (affirming agency determination to limit individual review to three companies accounting for the largest volume of subject imports, in rejecting claim that Commerce was required to conduct individual reviews of all voluntary respondents); Laizhou Auto Brake Equip. Co. v. United States, 32 CIT 711, 712-14, 722-28 (2008) (affirming agency determination to limit individual review to five companies selected using "probability-proportional-to-size" sampling methodology); *see generally* Def.-Ints.' Brief at 20-24 (analyzing the four cases referenced here); *id*. at 24 (observing that Mid Continent "ignores

_____

nuanced argument too late in this action, and, even then, has failed to adequately brief the point, depriving the other parties (and the court) of the ability to reasonably evaluate and address it, and relieving all of the need to do so.  It is, however, in any event clear that Mid Continent is conflating the analysis, and mixing apples and oranges.  Moreover, to state the obvious:  If Congress had wished to establish an absolute "floor" on the number of respondents to be the subject of individual review in an investigation where there are a "large number" of respondents, Congress plainly could have done so.  The fact that Congress elected not to do so means that interpretation of the statute is committed to Commerce's discretion, at least in the first instance.

the judicial precedent which clearly supports [Commerce's] respondent selection process," while "direct[ing] . . . attention to three decisions [*i.e.*, Zhejiang, Carpenter, and Schaeffler] . . . [that] are readily distinguishable from the facts in this case").[20]

In addition to its basic claim that Zhejiang, Carpenter, and Schaeffler required Commerce to individually review "at least four to eight" respondents (discussed above), Mid Continent also argues in its briefs that Commerce's respondent selection process was flawed because the respondents selected for individual review were "not representative of the Chinese industry as a whole."  Pl.'s Brief at 6; *see also id.* at 7, 9-10; Pl.'s Reply Brief at 3-5.  Mid Continent asserts that the Chinese nail industry is made up of both large, efficient producers and exporters (including the subsidiaries of foreign multinational companies, such as Stanley) and – according to Mid Continent – "literally hundreds of small and medium sized producers and exporters, with vastly different production efficiencies and pricing practices."  Pl.'s Brief at 6-7.  Mid Continent maintains that, had Commerce selected more respondents in the underlying administrative proceeding, "even with the refusal of certain companies to participate[,] the rate assigned to the other unreviewed Chinese exporters would have been more representative."  *Id.* at 9-10.[21]

_____

[20]*But cf.* Pl.'s Reply Brief at 8-9 (briefly discussing Ad Hoc Shrimp Trade Action Comm., 33 CIT at 1908-10, 1918-19, 675 F. Supp. 2d at 1292-94, 1300, solely in context of analysis of applicability of doctrine of exhaustion of administrative remedies).

[21]The Government astutely notes that – to the extent that Mid Continent argues that Commerce could have avoided the situation where the "all others" rate was calculated only by selecting additional respondents at the outset of the administrative proceeding – Mid Continent's hypothetical fails.  *See* Def.'s Brief at 11-12.  As the Government explains:

[H]ad Commerce selected four respondents (as Mid Continent claims it should have)

This "representativeness" claim is not only barred by the doctrine of exhaustion, it is also

beyond the scope of Mid Continent's Complaint in this matter.[22]  But, in any event, like Mid

---

at the beginning of the review, the outcome of the proceeding would have been exactly the same.  Because Commerce determined to review the largest companies by volume, as provided by § 1677f-1(c)(2), even if Commerce had chosen more respondents at the outset, those companies would have been Stanley, CPI, Tianjian, and Shandong, the same companies [that Commerce] attempted to review over the course of this proceeding.  The result thus would be exactly the same as in the current situation, *i.e.* the final rate for non-reviewed respondents would still be based only on Stanley's rate.

Def.'s Brief at 11-12.

The Government further explains that Commerce could not reasonably have been expected to choose yet another company to replace Shandong Minmetals when it stopped participating: "Given Commerce's limited resources and given the late stage in the proceedings – Shandong dropped out after the preliminary results had been issued – it was far too late in the proceedings to choose another respondent."  Def.'s Brief at 12.

[22]Specifically, as to the respondent selection process, Mid Continent's Complaint stated simply that "[Commerce] unlawfully chose to limit the number of mandatory respondents in the challenged administrative review to only two respondents – based on a claim of 'resource constraints.'  [Commerce's] decision to limit the number of mandatory respondents to only two companies on this basis is not supported by substantial evidence on the record and is otherwise not in accordance with law."  *See* Complaint, Count I.  It is possible to read the Complaint's reference to "resource constraints" as a reference to Zhejiang, Carpenter, Schaeffler, and Asahi Seiko (*see* n.16, *supra*), and as covering Mid Continent's basic (albeit misguided) respondent selection claim that Zhejiang, Carpenter, and Schaeffler together established some kind of "floor" requiring Commerce to individually review "at least four to eight" respondents in the administrative proceeding.  However, there is nothing in the language of the Complaint to put a reader on notice of any respondent selection "representativeness" claim.

As discussed above, Mid Continent's failure to exhaust its administrative remedies by raising its concerns about the respondent selection process in its administrative case brief filed with Commerce precludes Mid Continent from challenging that process in this forum.  *See* section III.A.1, *supra*.  But, even assuming that Mid Continent's failure to exhaust did not bar Mid Continent from challenging any aspect of Commerce's selection of respondents (which it does), a plaintiff is not permitted to use its briefs to expand its claims beyond those identified in its complaint.  Accordingly,

Continent's basic respondent selection claim, Mid Continent's representativeness claim too is without merit.

Mid Continent insists that the statute "clearly contemplates a situation where the sample size of respondents is 'statistically valid' or *the number of respondents selected is large enough to reasonably approximate the experience of all known exporters or producers that could not be examined*." Pl.'s Reply Brief at 4 (emphasis added). Mid Continent further contends that "selecting exporters or producers for review based on volume must involve enough respondents *to reflect the experience of a 'reasonable' volume of subject merchandise*." *Id*. (emphasis added). However, Mid Continent cites no authority for these novel propositions, which find no support in either the text of 19 U.S.C. § 1677f-1(c)(2) or the legislative history. To the extent that those sources speak to Mid Continent's "representativeness" claim, they contravene it. *See generally* 19 U.S.C. § 1677f-1(c)(2); SAA, H.R. Doc. No. 103-316, vol. 1 at 872-73, *reprinted in* 1994 U.S.C.C.A.N. at 4200-01.

On its face, the specific provision at issue expressly authorizes Commerce to limit individual review to a "reasonable number" of "exporters or producers accounting for the *largest volume* of the subject merchandise . . . that can be reasonably examined." 19 U.S.C. § 1677f-1(c)(2)(B) (emphasis added). Nothing in the language of that provision even hints that the exporters and producers

---

to the extent that Mid Continent now seeks to assert a claim contesting the "representativeness" of the respondents that Commerce chose, that claim is twice-barred – first because Mid Continent failed to raise *any* respondent selection issue in its administrative case brief, and, second, because the specific language of the Complaint raised only Mid Continent's basic respondent selection claim – *i.e.*, that Commerce erred in limiting individual review to two respondents, based on "resource constraints" (a claim which goes fundamentally to the basis, or grounds, for limiting individual review to two respondents) – and cannot fairly be read to cover "representativeness" (which goes essentially to the consequences of limiting review to two respondents).

selected for individual review must be "representative."  *See id*.; *see also* Def.'s Brief at 11 (stating

that "[a]ccepting Mid Continent's argument . . . would negate Section 1677f-1(c)(2)(B) of the statute

completely").  The focus in 19 U.S.C. § 1677f-1(c)(2)(B) is thus on capturing the greatest volume

of merchandise possible – a relatively straightforward methodology that seems likely in many

instances (including this case) to lead to results that differ from the results yielded by the type of

random sampling that is the alternative authorized under the other prong of the statute, § 1677f-

1(c)(2)(A).

Similarly, nothing in the relevant legislative history supports Mid Continent's assertion that

Commerce's selection of respondents for individual review on the basis of volume (§ 1677f-

1(c)(2)(B)) is constrained by concerns about representativeness.  Thus, for example, the SAA notes

generally that the new statutory provision, 19 U.S.C. § 1677f-1(c)(2), "provides that where there are

large numbers of exporters, producers, importers, or products involved in an investigation,

Commerce may limit its examination to: (1) a statistically valid sample of exporters, producers or

types of products; or (2) exporters and producers accounting for the largest volume of the subject

merchandise . . . that can reasonably be examined."  SAA, H.R. Doc. No. 103-316, vol. 1 at 872,

*reprinted in* 1994 U.S.C.C.A.N. at 4200-01.  The SAA then goes on to address sampling in some

detail: The SAA recognizes that "the authority to select samples rests exclusively with Commerce,

but, to the greatest extent possible, Commerce will consult with exporters and producers regarding

the method to be used."  *Id*., H.R. Doc. No. 103-316, vol. 1 at 872, *reprinted in* 1994 U.S.C.C.A.N.

at 4201.  In addition, the SAA explains that "[t]he phrase 'statistically valid sample' . . . is not a

substantive change from . . . 'generally recognized sampling techniques.'"  *Id*.  Even more to the

point, the SAA expressly provides that "Commerce will employ a sampling methodology designed to give *representative* results based on the facts known at the time the sampling method is designed," and underscores that "[t]his important qualification recognizes that Commerce may not have the type of information needed to select the *most representative* sample at the early stages of an investigation or review when [Commerce] must decide on a sampling technique." *Id.*, H.R. Doc. No. 103-316, vol. 1 at 872-73, *reprinted in* 1994 U.S.C.C.A.N. at 4201 (emphasis on "most" in the original; other emphases added). In other words, the SAA reflects concerns about the statistical validity and "representativeness" of the "sample of exporters, producers, or types of products" that is the subject of 19 U.S.C. § 1677f-1(c)(2)(A). But the SAA reflects no such concern as to the methodology authorized under § 1677f-1(c)(2)(B), the specific provision at issue here, where the emphasis is on maximum volume.

　　　Under the circumstances, it is enough to add that – notwithstanding Mid Continent's repeated use of the phrase in its representativeness argument[23] – neither the statute nor the legislative history makes any reference to "reasonable volume" (only "the *largest volume* of the subject merchandise . . . that can be reasonably examined"), just as the statute and the legislative history make no

---

　　　[23]*See, e.g.*, Pl.'s Reply Brief at 3-4 (arguing that "selecting exporters or producers for review based on volume [*i.e.*, as authorized by 19 U.S.C. § 1677f-1(c)(2)(B)] must involve enough respondents to reflect the experience of a '*reasonable*' *volume* of the subject merchandise") (emphasis added); *id.* at 4 (asserting that, if selecting the two largest exporters or producers out of a total of 159 companies accounts for only a certain percentage of total subject import volume, "this does not appear to reflect the experience of a '*reasonable*' *volume* of shipments of the subject merchandise") (emphasis added); *id.* at 5 (arguing that "selecting respondents by largest import volumes implies that the import volumes must be large enough to reflect the experience of a '*reasonable*' *volume* of the subject merchandise") (emphasis added).

reference to "representativeness" in the context of respondents selected for individual review

pursuant to 19 U.S.C. § 1677f-1(c)(2)(B).  (Emphasis added.)  Accordingly, even if it were to be

considered on its merits, Mid Continent's claim that Commerce was required to select respondents

for individual review with an eye toward capturing "potential variability across the population"

would be unavailing.  *See* Pl.'s Reply Brief at 4-5 (*quoting* Proposed Methodology for Respondent

Selection in Antidumping Proceedings; Request for Comment, 75 Fed. Reg. 78,678 (Dec. 16,

2010)).[24]

---

[24]In its reply brief, Mid Continent supports its representativeness argument by citing to a proposal that Commerce floated in late 2010 concerning its methodology for selecting respondents in proceedings where the "large number" of respondents precludes the agency's individual review of all companies.  *See* Proposed Methodology for Respondent Selection in Antidumping Proceedings; Request for Comment, 75 Fed. Reg. 78,678 (Dec. 16, 2010) ("Proposed Methodology"); Pl.'s Reply Brief at 4-5.  Mid Continent emphasizes that, under the proposal, Commerce would select respondents via sampling (pursuant to 19 U.S.C. § 1677f-1(c)(2)(A)) – rather than by import volume (pursuant to 19 U.S.C. § 1677f-1(c)(2)(B)) – except in certain circumstances, including "when the largest companies by import volume account for at least 75 percent of total imports."  Proposed Methodology, 75 Fed. Reg. at 78,678; Pl.'s Reply Brief at 5. According to Mid Continent, that language in the proposal "indicates that selecting respondents by largest import volumes implies that the import volumes must be large enough to reflect the experience of a 'reasonable' volume of the subject merchandise, thereby representing the experience of unreviewed respondents."  *Id*.

The proposal acknowledges that – as Mid Continent argues – one consequence of Commerce's general practice of selecting respondents based on volume (rather than by sampling) is that "companies under investigation or review with relatively smaller import volumes have typically not been selected . . . for individual examination," such that their experience is not necessarily reflected in Commerce's analysis and calculations. Proposed Methodology, 75 Fed. Reg. at 78,678.  However, beyond establishing that general proposition (which is not in dispute here), the proposal does little else to advance Mid Continent's argument.

Because the proposal is addressed only in a single paragraph in Mid Continent's reply brief, detailed consideration is not warranted.  It is nevertheless worth noting that, first, Commerce has published nothing further concerning the proposal since late 2010.  Thus, not only was the proposed

The bottom line is that none of Mid Continent's arguments undermines in any way

Commerce's interpretation and application of 19 U.S.C. § 1677f-1(c)(2)(B) in the circumstances of

───────────────────

methodology not in place at the time of the administrative review at issue here, but, even now, the proposed methodology has not been adopted.  Moreover, as Mid Continent acknowledges (*see* Pl.'s Reply Brief at 5), the proposal itself states that Commerce generally would not use sampling "[i]f, due to resource constraints, [Commerce] is unable to examine at least three companies."  Proposed Methodology, 75 Fed. Reg. at 78,678.  Accordingly, even if the proposal had been in place at the time of the review at issue, the new methodology would not have applied in this case, because Commerce here determined that agency resource constraints limited individual review to two companies.  *See* First Respondent Selection Memorandum at 1, 3, 5 (memorializing Commerce determination to select for individual review "the two largest exporters by volume").

Further, even Mid Continent does not contend that Commerce is required by statute or regulation – or even any existing standard practice – to select a sufficient number of individual respondents to capture at least 75% (or any other specific percentage) of total import volume.  Under the proposal, Commerce generally would "forgo sampling" in instances "when the largest companies by import volume account for at least 75 percent of total imports."  Proposed Methodology, 75 Fed. Reg. at 78,678.  But, while adoption of the proposal perhaps would establish a standard agency practice (with all the attendant implications that would flow from that, as a matter of administrative law), that does not mean that Commerce then would be obligated to select mandatory respondents by sampling any time selection by volume *would not* capture 75% of total imports.  In addition, the proposal takes pains to make it clear, using hedging language, that – while the proposal would, in essence, establish sampling as the "default" option for respondent selection (in lieu of selecting respondents based on import volume) – sampling would be used "where possible," and that sampling "in general" would not be used in certain enumerated circumstances (two of which are outlined above).  *See generally id.*

Finally, and most fundamentally, the very broad discretion that Congress has accorded Commerce (both in general, and specifically with respect to respondent selection) obviously permits the agency itself to exercise its discretion and determine – on a case-by-case basis, or as a general matter of policy – that sampling is preferable to selecting respondents based on import volume (or *vice versa*).  But Commerce, in any event, will retain the full measure of statutory authority and the abundant discretion that Congress has unambiguously conferred on the agency, authorizing Commerce to select respondents for individual review in a case such as this one either by use of sampling or by reference to import volume.  *See* 19 U.S.C. § 1677f-1(c)(2)(A) & (B).  In this case, Commerce relied on the statute and, in its discretion, selected respondents for individual review based on volume of imports.  Nothing in the proposal that Mid Continent has cited suggests that Commerce's actions here abused the agency's ample discretion.

this case.[25]  Most telling is the conspicuous absence from Mid Continent's briefs of any reference

to Chevron vis-a-vis the statutory provision at issue, including the key terms "*reasonable number*

*of exporters or producers*" and "exporters and producers *accounting for the largest volume* of the

subject merchandise . . . that can be *reasonably* examined." 19 U.S.C. § 1677f-1(c)(2)(B) (emphases

added); Chevron, 467 U.S. at 842-45; *compare*, *e.g.*, Pakfood, 35 CIT at ____, 753 F. Supp. 2d at

1342 (noting that "neither the [antidumping duty] statute nor any of Commerce's regulations directly

address[es] the methodology by which [Commerce] is to arrive at the number of 'exporters and

producers accounting for the largest volume of subject merchandise . . . that can be reasonably

examined,'" and invoking Chevron standard); Schaeffler, 35 CIT at ____, 781 F. Supp. 2d at 1362-

63 (applying Chevron analysis to interpret terms "reasonable number of exporters or producers" and

"large number of exporters or producers");  Carpenter, 33 CIT at 1727-29, 662 F. Supp. 2d at 1342-

43 (interpreting term "large number of exporters or producers" pursuant to Chevron analysis).

    In sum, there is no merit to Mid Continent's basic claim that "Commerce's decision to select

---

[25]Nothing herein should be understood to suggest that Commerce's discretion to choose between the two methodologies specified in 19 U.S.C. § 1677f-1(c)(2) is wholly unfettered, or that "representativeness" could never constrain Commerce's ability to rely on 19 U.S.C. § 1677f-1(c)(2)(B) or affect a determination as to whether a specific number of exporters and producers is "reasonable" given the facts of a particular case.  Those issues are not presented here.  It is enough to note that Mid Continent here has proffered no Chevron analysis of the statute or cited *any* statutory authority other than 19 U.S.C. § 1677f-1(c)(2), which Mid Continent candidly acknowledges sets no "minimum . . . on the number of respondents . . . , or the volume of imports that should be covered" by respondents subject to individual review.  *See* Mid Continent First Comments on Respondent Selection at 3.  Under the circumstances of this case, on the strength of the administrative record developed by the parties before the agency, and based on the briefs filed with the court, Mid Continent has failed to demonstrate that Commerce erred in any way in its selection of respondents for individual review in the administrative review at issue.

only two Chinese exporters for individual examination, based on claimed 'resource constraints,' is contrary to law." *See* Pl.'s Brief at 1; *see also* Complaint, Count I.  Commerce's decision not to conduct individual reviews of all respondents was properly based on the agency's determination that the proceeding here involved a "large number" of exporters and producers – a determination that Mid Continent does not contest.  *See* 19 U.S.C. § 1677f-1(c)(2); Pl.'s Brief at 7 (confirming that Mid Continent does not contest that proceeding in question involved "large number" of exporters and producers).

Moreover, under the circumstances, there was nothing unlawful about Commerce's reference to agency resource constraints.  *See*, *e.g.*, First Respondent Selection Memorandum at 1-3 (explaining basis for Commerce's determination that 159 exporters/producers constitutes a "large number," and outlining basis for limiting individual examination to two companies; referring, *inter alia*, to Commerce's "current resource constraints," the agency's "available resources," the "significant" resources "that would be necessary to individually examine all 159 exporters/producers," "the finite available resources and [Commerce's] already heavy workload," and the lack of "resources to fully examine all of the companies for which [Commerce] received a request for review").  The line of cases that Mid Continent cites – including <u>Zhejiang</u>, <u>Carpenter</u>, and <u>Schaeffler</u> – holds only that, in proceedings that do not involve a "large number" of exporters and producers, Commerce may not rely on resource constraints to avoid conducting individual reviews of all respondents.  Mid Continent has cited no authority to support its claim that, in proceedings which involve a "large number" of exporters and producers (such as this one), Commerce is prohibited from considering its resource constraints in determining the number of respondents to be

subject to individual review.  Quite to the contrary, the relevant statutory provision clearly

contemplates Commerce's consideration of agency resource constraints, among other factors.  *See*

19 U.S.C. § 1677f-1(c)(2)(B) (referring to "the largest volume of the subject merchandise . . . *that*

*can be reasonably examined*") (emphasis added).   There was thus nothing unlawful about

Commerce's consideration of resource constraints here, where the agency also properly concluded

that the proceeding involved a "large number" of exporters and producers, rendering individual

review of all respondents impracticable.

Commerce's determination to limit the number of mandatory respondents to the two

respondents selected is similarly supported by substantial evidence and in accordance with law.  Mid

Continent has barely fleshed out, much less adequately supported, its contentions that two was not

a "reasonable number" and that Commerce's selection of respondents failed to "account[] for the

largest volume of the subject merchandise . . . that [could] be reasonably examined."  *See* 19 U.S.C.

§ 1677f-1(c)(2)(B).  As noted above, Mid Continent has not analyzed the key terms of the statute

pursuant to Chevron; and Commerce's determinations in the administrative record do not directly

address the issues of statutory construction that are implicated by Mid Continent's claims.[26]

Nevertheless, Commerce's implicit construction of the statute in this case must be reviewed

in accordance with the fundamental Chevron framework.  The first issue is thus whether Congress

has directly spoken to the precise question at issue.  If so, the court must give effect to the

unambiguously expressed intent of Congress.  Chevron, 467 U.S. at 842-43.  On the other hand, "if

---

[26]Nor has the Government identified any other document or proceeding where Commerce has
formally articulated its construction of 19 U.S.C. § 1677f-1(c)(2)(B).

the statute is silent or ambiguous with respect to the specific issue" presented, the agency's

construction must prevail, provided that it is a permissible construction of the statute. *Id.*, 467 U.S.

at 843. "[A] court may not substitute its own construction of a statutory provision for a reasonable

interpretation" that is proffered by the agency that is charged with administering and implementing

the statute. *Id.*, 467 U.S. at 844.

Certainly Congress has not spoken specifically to whether two is a "reasonable number" of

respondents for individual review in a case such as this. *See* 19 U.S.C. § 1677f-1(c)(2). Nor has

Congress spoken directly to more generally define "reasonable number," except to the extent that

the text of 19 U.S.C. § 1677f-1(c)(2)(B) – *i.e.*, the reference to "exporters and producers accounting

for the largest volume of the subject merchandise . . . that can be reasonably examined" – can be read

to constitute the definition of "reasonable number." *See* 19 U.S.C. § 1677f-1(c)(2)(B).[27]   And

_____

[27]In 19 U.S.C. § 1677f-1(c)(2)(B), Congress has instructed Commerce that – where the
agency elects to select mandatory respondents based on import volume – Commerce is to select the
"exporters and producers accounting for *the largest volume* of the subject merchandise . . . that *can
be reasonably examined*." *See* 19 U.S.C. § 1677f-1(c)(2)(B) (emphases added). The statute thus
appears to require Commerce to survey its available resources (and to evaluate any other relevant
factors), and, based on that assessment, to then identify those exporters and producers that will yield
"the largest volume" of imports for individual review in the proceeding. However, as a general
canon of statutory interpretation, the language of a statute is to be construed to avoid treating terms
as surplusage. *See* Board of Trustees of the Leland Stanford Junior University v. Roche Molecular
Systems, Inc., ____ U.S. ____, ____, 131 S. Ct. 2188, 2196 (2011); 2A N. Singer & J. Singer,
*Sutherland Statutory Construction* § 46.7, at 265-66 (7th ed. 2007). And, if the statute is read as
suggested immediately above, it is not clear that the phrase "reasonable number" in the introductory
language of 19 U.S.C. § 1677f-1(c)(2) has any meaning – unless 19 U.S.C. § 1677f-1(c)(2)(B)
actually serves to define the term "reasonable number" for those instances where Commerce decides
to use import volume to limit the number of respondents for individual review. *See generally* 19
U.S.C. § 1677f-1(c)(2). Moreover, while it seems possible (perhaps even likely) that the language
of 19 U.S.C. § 1677f-1(c)(2)(B) is intended to define "reasonable number" for those instances where
Commerce decides to use import volume to limit the number of respondents for individual review,

Congress has not spoken directly to the meaning of "the largest volume of the subject merchandise . . . that can be reasonably examined" to the extent that those terms are implicated by Mid Continent's claims. *Cf.* Pakfood, 35 CIT at ____, 753 F. Supp. 2d at 1342 (explaining that, because "neither the [antidumping duty] statute nor any of Commerce's regulations directly address[es] the methodology by which [Commerce] is to arrive at the number of 'exporters and producers accounting for the largest volume of the subject merchandise . . . that can be reasonably examined,' . . . the court will uphold Commerce's methodology if it is reasonable, . . . and is not arbitrarily applied").

The administrative record here documents that Commerce properly gave thoughtful and careful consideration to various factors, including its resource constraints, and – at each stage of the proceeding – determined how to select respondents so as to "account[] for the largest volume of the subject merchandise . . . that [could] be reasonably examined." *See* 19 U.S.C. § 1677f-1(c)(2)(B); First Respondent Selection Memorandum (concerning selection of Stanley and CPI); Second Respondent Selection Memorandum (concerning selection of Stanley and Tianjin Xiantong, which replaced CPI); Third Respondent Selection Memorandum (concerning selection of Stanley and

---

it is less clear that the language of 19 U.S.C. § 1677f-1(c)(2)(A) can be read as serving the same purpose with respect to those instances where Commerce elects to use sampling to limit the number of respondents for individual review.

For purposes of the instant analysis, it is unnecessary to definitively resolve this issue. However, a clear, cohesive construction of the statute by Commerce would be useful. Such a construction might have been forthcoming in the Final Results in this proceeding, particularly if Mid Continent had raised its respondent selection claims in the administrative case brief that it filed with the agency following issuance of the Preliminary Results, and if Mid Continent had properly "teed up" the statutory interpretation issues that are inherent in those claims.

Shandong Minmetal, which replaced Tianjin Xiantong).[28]   In the process, Commerce (at least

implicitly) construed the statute in such a way as to mean that, under the circumstances of this case,

the mandatory respondents that the agency selected "account[ed] for *the largest volume of the subject*

*merchandise . . .* that [could] be *reasonably* examined." *See* 19 U.S.C. § 1677f-1(c)(2)(B) (emphases

added).  Under the circumstances of this case, the agency's construction of the statute appears to be

a permissible one, and therefore must be sustained.

Mid Continent offers nothing to cast doubt on Commerce's implicit construction of 19

U.S.C. § 1677f-1(c)(2)(B).  Mid Continent similarly points to no concrete record evidence to

substantiate its suggestion that Commerce's resources would have permitted the agency to

individually review additional respondents and thus to increase the volume of merchandise subject

to such review.[29]   In any event, as a matter of sound public policy, "agencies with statutory

---

[28]*See*, *e.g.*, Longkou, 32 CIT at 1152-53, 581 F. Supp. 2d at 1354 (affirming agency
determination to limit individual review to three companies, based on, *inter alia*, record evidence
showing that "Commerce conducted a careful evaluation of its resource capabilities," including an
examination of "the number of cases, respondents, and analysts it had at its disposal"; concluding
that "Commerce's decision to limit its review . . . to the three mandatory respondents [was]
reasonable, and supported by substantial evidence").

[29]*See generally* Laizhou, 32 CIT at 726 (affirming reasonableness of agency determination
to limit individual review to five companies, explaining, *inter alia*, that "[t]he record does not show,
and Plaintiffs did not demonstrate, that Commerce could have conducted more individual
examinations without undue burden and without inhibiting the timely completion of the
investigation"); Longkou, 32 CIT at 1152-53, 581 F. Supp. 2d at 1353-54 (sustaining agency
determination limiting individual review to three companies, refuting plaintiffs' contention that
acceptance of additional respondents "would not have significantly increased Commerce's
administrative burden," and rejecting plaintiffs' assertion that Commerce "'failed to offer any
evidence to support its claim that reviewing more than three companies would have created an undue
burden'").

enforcement responsibilities," such as Commerce, "enjoy broad discretion in allocating investigative

and enforcement resources." Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995)

───────────────────

        International trade proceedings are, by definition, complicated and complex; and some are
even more demanding than others, forcing Commerce to simultaneously juggle many constantly-
changing priorities and demands, and to make difficult determinations about the optimal allocation
of the agency's finite resources.  In the instant case, from the outset, Commerce was faced with 159
respondents subject to review; and, in addition to conducting individual examinations of the two
mandatory respondents, Commerce – at Mid Continent's urging – also undertook an intensive and
wide-ranging review of CPI's "no shipment" claim.  At the same time, the agency was analyzing
separate rate applications and certifications submitted by literally dozens of companies, and
determining the status of the remaining respondents who were not participating in the proceeding.
The numerous other facets of the proceeding included Commerce's on-site verification of one of
CPI's suppliers at the supplier's nail-producing facility in the PRC, where, *inter alia*, Commerce
interviewed company officials, analyzed the company's structure and financial records, and reviewed
the company's sales and production processes.  *See* Third Respondent Selection Memorandum at
2-3; Commerce's Verification Outline (Pub. Doc. No. 328); *see also* Def.-Ints.' Brief at 2, 17, 23,
27 (describing Commerce's multiple competing priorities).

        In addition to the pressures and strains of this proceeding, the same Commerce staffers were
also charged with responsibility for numerous concurrent antidumping proceedings, including
complex investigations and administrative reviews, and a multitude of scope ruling requests, as well
as several court remands.  *See* First Respondent Selection Memorandum at 2-3.  Making matters
worse, "the deadlines for a number of the cases coincide[d] and/or overlap[ped] with the deadlines
in this antidumping proceeding." *Id*. at 3.

        For obvious reasons, courts are generally chary of playing "Monday morning quarterback,"
second-guessing agency decisions concerning enforcement priorities and resources.  For the same
reasons, the courts have been understandably reluctant to second-guess Commerce's determinations
concerning resources, feasibility, and respondent selection determinations in investigations and
administrative reviews in antidumping and countervailing duty proceedings.  *See generally*, *e.g.*,
Longkou, 32 CIT at 1152, 581 F. Supp. 2d at 1353-54 (rejecting plaintiffs' contention that accepting
additional respondents "would not have significantly increased Commerce's administrative burden,"
emphasizing that, "[w]hile conducting an administrative review of an antidumping duty order
Commerce is charged with a number of different tasks," including "the analysis of each company's
response, the collection and analysis of surrogate value data for each unique part used by each
respondent, and performing the margin calculations for each respondent," each of which "require[s]
the expenditure of significant resources").

(*citing* Heckler v. Cheney, 470 U.S. 821, 831 (1985)).  As the Court of Appeals emphasized in

Torrington, any different allocation of authority between the agency and the courts would be

unworkable, "put[ting] the Court of International Trade and [the Court of Appeals] in the position

of routinely second-guessing [Commerce's] decisions" on a wide range of matters (including the

minutiae of respondent selection) in individual cases – "a role for which courts are ill-suited and one

that could be quite disruptive of Commerce's efforts to establish enforcement priorities" in the

conduct of antidumping investigations and administrative reviews.  Torrington, 68 F.3d at 1351.[30]

The long and the short of the matter is that, even if consideration of Mid Continent's

challenge to Commerce's selection of mandatory respondents were not barred, the challenge is

lacking in merit.  Commerce here reasonably exercised its broad discretion by selecting for

individual review the two respondents that imported the largest volume of subject merchandise.  Mid

Continent's challenge therefore must be rejected, and Commerce's selection of mandatory

respondents sustained.

## B. Commerce's Treatment of Entries Initially Mis-Attributed to CPI

Mid Continent casts its second claim – which challenges Commerce's determinations

concerning the treatment of the entries of 23 companies that were initially mis-attributed to CPI –

---

[30]The public policy concerns that motivated the Court of Appeals in Torrington have found
thoughtful application in cases involving challenges to Commerce's respondent selection
determinations.  *See*, *e.g.*, Longkou, 32 CIT at 1151, 581 F. Supp. 2d at 1353 (*quoting* Torrington,
and underscoring that "any assessment of Commerce's operational capabilities . . . must be made by
the agency itself"); Laizhou, 32 CIT at 726 (*quoting* Torrington); Ad Hoc Shrimp Trade Action
Comm., 33 CIT at 1917-18, 675 F. Supp. 2d at 1299 (same).

as an example of a "serious" and "growing" phenomenon of "obvious evasion" of antidumping

duties, to which Mid Continent claims Commerce has "turned a blind eye."  *See* Pl.'s Brief at 11,

13; *see generally* Pl.'s Brief at 1-2, 10-14; Pl.'s Reply Brief at 9-15.  Specifically, according to Mid

Continent, "[t]he misuse of combination rates is being observed in an increasing number of

Commerce proceedings, and reflects, in many cases, deliberate efforts by foreign exporters and/or

U.S. importers to take advantage of a different company's duty deposit rate that is significantly lower

than their own."  Pl.'s Brief at 10-11.

      As detailed in section I.B above, Commerce explained in the Issues & Decision

Memorandum issued in support of the Final Results that the agency was instructing Customs to

liquidate the entries at issue depending on whether the company was one of the 13 companies that

had knowledge that its goods were destined for the United States or one of the 10 companies for

which no record evidence demonstrated a connection to CPI.  *See* section I.B, *supra* (discussing

Issues & Decision Memorandum at 24-25).  For the group of 13 companies, Commerce stated that

it would instruct Customs to liquidate entries at "the separate rate [the companies] earned either in

the [underlying antidumping] investigation or in this review, as applicable."  *See* Issues & Decision

Memorandum at 24.[31]   As to the other 10 companies, Commerce indicated that it would instruct

---

[31]Based on Commerce's instructions, the entries of those of the 13 companies that earned a
separate rate in the administrative review would be liquidated at 10.63%, while the entries of those
that earned a separate rate in the investigation but not in the administrative review would be
liquidated at 21.24%.  *See* Antidumping Order, 73 Fed. Reg. at 44,963-64 (listing CPI's various
combinations, all of which earned rate of 21.24% in investigation); Amended Final Results, 76 Fed.
Reg. at 23,280 (listing certain companies that held combination rates with CPI, all of which earned
separate rate of 10.63% in administrative review).

Customs to "assess [antidumping] duties at the rate in effect at the time of entry."  *See id*. at 25.[32]

In addition, acknowledging record evidence indicating that "some entries may have been classified under the incorrect combination rate," Commerce advised that it was also referring this matter to Customs for possible enforcement action.  *See id*.

     Mid Continent takes strong exception to these determinations by Commerce, and maintains that all of the entries at issue should be subject to the PRC-wide rate – the highest rate in the proceeding, 118.04%.  *See* Pl.'s Brief at 11, 13; Pl.'s Reply Brief at 11, 14-15.  Mid Continent asserts broadly that the 23 companies in question "repeatedly misidentif[ied] significant volumes of imports in order to claim CPI as the exporter and apply its duty deposit rate," and are guilty of "obvious evasion."  Pl.'s Brief at 2; Pl.'s Reply Brief at 10.  In addition, Mid Continent raises a handful of legal arguments.  *See* Pl.'s Brief at 11, 13-14; Pl.'s Reply Brief at 10, 14-15.

     For their part, the Government and Defendant-Intervenors argue that – without regard to whether there is (as Mid Continent contends) a ""growing and serious' problem with combination rates" and evasion in other proceedings – the instant proceeding cannot fairly be portrayed as an example of any such phenomenon, and, moreover, that it would have been entirely inappropriate for Commerce to have based its actions here on Mid Continent's "bare speculations of fraud [and] illegal activity."  Def.'s Brief at 17; Def.-Ints.' Brief at 36.  The Government and Defendant-Intervenors reject Mid Continent's other arguments as similarly lacking in merit, and maintain that Commerce's

---

[32]Based on Commerce's determination, entries attributed to these 10 companies would be liquidated at 21.24%, the rate at which the entries came into the United States (*i.e.*, CPI's cash deposit rate).  Antidumping Order, 73 Fed. Reg. at 44,963-64 (listing CPI's multiple combinations, all of which were assigned rate of 21.24% in investigation).

determinations concerning the treatment of the entries at issue are supported by substantial evidence and otherwise in accordance with law, and therefore should be sustained. Def.'s Brief at 7-8, 12-13; Def.-Ints.' Brief at 32, 35; *see generally* Def.'s Brief at 7-8, 12-17; Def.-Ints.' Brief at 3, 31-38.

As outlined below, Mid Continent's arguments are largely unavailing. However, its contention that Commerce's actions here were inconsistent with the agency's established, longstanding practice in market economy reviews requires a remand. *See generally* Pl.'s Brief at 2, 13-14; Pl.'s Reply Brief at 14-15.

### 1. Mid Continent's Arguments Challenging Record Facts

Mid Continent's second claim is – at its core – fundamentally predicated on Mid Continent's allegations that the 23 companies that initially mis-attributed entries to CPI did so deliberately and intentionally, for the purpose of "improperly avoid[ing] (or evad[ing])" antidumping duties. *See* Pl.'s Brief at 5. According to Mid Continent, the 23 companies were "shopping for the lowest cash deposit rate," in an "obvious manipulation" of the antidumping duty system. *See id*.; Pl.'s Reply Brief at 14. The evidence belies Mid Continent's assertions.[33]

Mid Continent argues that the record does not support Commerce's liquidation instructions for entries of the 13 companies with which CPI acknowledged doing business. Specifically, Mid Continent accuses the 13 companies and/or their importers of "deliberately us[ing] CPI's

---

[33]Mid Continent also contends that application of the PRC-wide rate is required even if there is "no [finding] of 'malfeasance' on the part of the Chinese exporters (and/or the U.S. importers who brought in the goods)." Pl.'s Reply Brief at 10. This assertion goes to whether Commerce has a blanket policy of taking action against companies that use the wrong exporter's rate (whether purposefully, or otherwise), and is addressed below. *See* section III.B.3, *infra*.

combination rate codes to take advantage of [CPI's] cash deposit rate."  Pl.'s Brief at 12.  However,

neither the companies responsible for exporting virtually the entire volume of the merchandise

initially mis-attributed to CPI, nor their importers, had any motive or incentive whatsoever to "take

advantage" of CPI's cash deposit rate.

Twelve of the 13 Chinese producers in question were entitled to enter steel nails during the

review period at the same rate as entered without using the combination rate they shared with CPI.

In addition to sharing a combination rate with CPI (in which CPI was the exporter), each of those

12 companies also had combination rates in which they were listed as exporter.  *See* Antidumping

Order, 73 Fed. Reg. at 44,963-65 (showing that 12 companies had combination rates as producers

and as exporters, all of which were 21.24%); *see* Def.-Ints.' Brief at 32.  Thus, as a practical matter,

their rates were the same, either way.  Those 12 companies – which accounted for essentially all of

the import volume mis-attributed to CPI – simply had nothing to gain by using the combination rate

they shared with CPI.[34]  Mid Continent fails to explain why, in light of these facts, the companies

would "deliberately use[] CPI's combination rate[s]" or how the mis-attribution of entries to CPI

constituted "tak[ing] advantage" of CPI's cash deposit rate.  As for the sole remaining company,

there is not a scintilla of record evidence to substantiate Mid Continent's claim that the company was

deliberately using CPI's combination rate to take advantage of CPI's cash deposit rate.  *See* Def.'s

---

[34]The 12 companies accounted for [[     ]] of the total volume of imports attributed to CPI.
*See* CPI Comments on Respondent Selection at Exh. 2 (indicating quantity of subject merchandise
attributable to each company that shared combination rate with CPI).

Brief at 12-13, 16-17; Def.-Ints.' Brief at 35.[35]

Mid Continent also charges that Commerce ignored the possibility that CPI's suppliers were being used as conduits for other nail suppliers. Pl.'s Brief at 12. Yet again, the sole evidence of record is to the contrary. To follow up on Mid Continent's allegations, Commerce conducted an on-site verification of one of the 13 companies, Tianjin Jinchi Metal Products Co., Ltd. Through that verification, Commerce confirmed that all but a tiny fraction of the nails exported to the United States by Tianjin Jinchi were, in fact, produced by Tianjin Jinchi. *See* Tianjin Jinchi Verification Results at 5 (Conf. Doc. No. 149).[36]

Mid Continent cites no proof in support of its claims as to Tianjin Jinchi or any of the other companies. Instead, Mid Continent attempts to analogize this case to Jia Farn, a case in which Commerce received information that an exporter not covered by an antidumping order was shipping sweaters manufactured by other producers that were covered by an antidumping order (and thus subject to antidumping duties that those producers were not paying). *See generally* Jia Farn Mfg. Co. v. Sec'y of Commerce, 17 CIT 187, 194, 817 F. Supp. 969, 975 (1993); Pl.'s Brief at 12. But, in this case, unlike Jia Farn, there is no evidence of intentional evasion by any entity.

Ultimately, the burden of creating an adequate record lies with interested parties, not with

_____

[35][[                                                                        ]] was the only one of the 13 companies that did not receive its own combination rate as an exporter in the antidumping investigation. *See* Antidumping Order, 73 Fed. Reg. at 44,963-65.

[36]Specifically, Commerce's investigation revealed that all but a portion of less than [[  ]] of the nails exported to the United States by Tianjin Jinchi were produced by Tianjin Jinchi itself. *See* Def.-Ints.' Conf. Brief at 17 (*citing* Tianjin Jinchi Verification Results at Exh. I).

Commerce.  QVD Food Corp. Ltd. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011).  Here,

Mid Continent has failed to adduce any evidence to support its claims that CPI's suppliers were

being used as conduits, or were otherwise abusing the system in any way.  Commerce investigated

Mid Continent's charges by conducting an on-site verification of Tianjin Jinchi, and found no

evidence that other companies were using Tianjin Jinchi as a conduit.  As a matter of law, Commerce

has discretion over how to verify factual information; and there is no indication that Commerce

abused its ample discretion here.  See 19 C.F.R. § 351.307(b)(3).  As such, Mid Continent's claims

are not supported by the record, and must therefore be rejected.

Mid Continent further contends that the record does not support Commerce's determination

that entries attributed to the other 10 companies that shared rates with CPI should be liquidated at

the rates they claimed at the time of entry.  See Pl.'s Brief at 12-13; Pl.'s Reply Brief at 13-14.

However, CPI explained on the record that the entries at issue were the product of clerical "coding

errors upon entry or differences in timing," not intentional evasion.  See Partial Rescission

Memorandum at 4; see also CPI Response to Mid Continent Comments on Respondent Selection

at 2-3 (Conf. Doc. No. 12); CPI Comments on Respondent Selection at Exh. 7 (exhibit entitled "Red

Herring No. 3").  Mid Continent has proffered no evidence to the contrary.  In light of the

explanation on the record, and particularly in the absence of any proof of evasion, Commerce

reasonably exercised its considerable discretion and declined to impose what would (in effect) be

a punitive rate on the subject entries.

Speculation and surmise are no substitute for affirmative evidence.  Here, Mid Continent's

allegations of deliberate misuse of CPI's cash deposit rate find no support in the administrative

record and therefore must be rejected.

## 2. Mid Continent's Legal Arguments

In addition to its assertions that the 23 companies intentionally mis-attributed entries to CPI, Mid Continent also raises several legal arguments in an effort to support its claim that the entries at issue should be subject to the PRC-wide rate.  As discussed below, however, Mid Continent's arguments and authorities do little to advance its cause.

Citing Policy Bulletin 05.1, Mid Continent argues that Commerce's decision not to take action in response to the alleged misuse of CPI's duty deposit rate contradicts the agency's practice of applying combination rates only to the specific exporter and producer to whom a particular combination rate is specifically assigned. *See* Pl.'s Brief at 11 (*citing* Import Administration Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries (2005) ("Policy Bulletin 05.1") at 6 ). Policy Bulletin 05.1 outlines Commerce's policy of assigning exporter-producer-specific combination rates in investigations.  But the bulletin is silent as to the consequences, if any, when merchandise is entered at the wrong exporter's rate.  In other words, contrary to Mid Continent's implication, Policy Bulletin 05.1 does not establish any agency practice or document any legal obligation requiring Commerce to use the PRC-wide rate – even in circumstances where (unlike here) abuse of the combination rate system has been proved.

Moreover, as a practical matter, the problem to which Policy Bulletin 05.1 in particular, and the combination rate system more generally, are addressed is not present here.  The purpose of the

combination rate system is to prevent companies from seeking to circumvent the imposition of antidumping duties by "shifting exports through exporters with the lowest assigned cash-deposit rates." Policy Bulletin 05.1 at 7. However, as explained above, 12 of the companies in question – representing virtually all of the import volume at issue – could have entered steel nails during the review period at the same rate as entered without using the combination rate they shared with CPI, because each of those 12 companies also had combination rates in which they were listed as exporter, and those rates were the same as the combination rates that each shared with CPI. As such, Commerce's decision to allow the use of CPI's duty deposit rates for entries exported by Chinese companies does not contradict Policy Bulletin 05.1 by encouraging or enabling companies to shift exports in any meaningful way. Mid Continent's reliance on Policy Bulletin 05.1 is thus misplaced.

Invoking 19 U.S.C. § 1592(a) and 19 C.F.R. §§ 162 & 171 (Appendix B), Mid Continent further asserts that "[e]ntering goods from one exporter using the [antidumping duty] margin of another is a violation of law and a subversion of administrative process." Pl.'s Brief at 11 (*citing* 19 U.S.C. § 1592(a) ("Penalties for fraud, gross negligence, and negligence": "Prohibition"); 19 C.F.R. § 162 ("Inspection, Search, and Seizure") & 171 (Appendix B) ("Customs Regulations, Guidelines for the Imposition and Mitigation of Penalties for Violations of 19 U.S.C. 1592")). It is of course true that entering goods at an improper rate may involve negligence, or even fraud. But mis-attribution also may be the result of "[c]lerical errors or mistakes of fact." *See* 19 U.S.C. § 1592(a)(2) ("Exception") (specifying that "[c]lerical errors or mistakes of fact are not violations . . . unless they are part of a pattern of negligent conduct"). In any event, neither the statute nor the regulations cited by Mid Continent mandates that Commerce apply the PRC-wide rate to entries that

were entered at an incorrect rate – which is the result that Mid Continent advocates.

Further, under the statute cited by Mid Continent – *i.e.*, 19 U.S.C. § 1592, it is Customs, not Commerce, that is charged with responsibility for enforcement of the laws prohibiting material false statements and omissions in customs entry documentation.  *See* 19 U.S.C. § 1592(b).[37]  As such, even assuming that violations such as those alleged by Mid Continent may have occurred, the investigation of any such potential violations would fall squarely within Customs' domain. Commerce here thus acted properly in referring to Customs the issue of whether certain companies may have acted negligently or fraudulently in using CPI's rate.  *See* Issues & Decision Memorandum at 25 (taking note of "record evidence that some entries may have been classified under the incorrect combination rate," and advising that the matter was being referred to Customs for possible enforcement action).

Mid Continent's third legal argument is based on Jia Farn and Tung Mung.  *See generally* Pl.'s Reply Brief at 10 (*citing* Jia Farn, 17 CIT at 194, 817 F. Supp. at 975; Tung Mung Development Co. v. United States, 26 CIT 969, 978-79, 219 F. Supp. 2d 1333, 1343 (2002), *aff'd*, 354 F.3d 1371 (Fed. Cir. 2004)).  Relying on those two cases, Mid Continent asserts broadly that, "[b]y allowing the 23 Chinese exporters, and/or their U.S. importers, to misuse CPI's duty deposit rate," Commerce

---

[37]In general, 19 U.S.C. § 1592(a) prohibits the use of material false statements and material omissions to "enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States."  19 U.S.C. § 1592(a)(1) ("General Rule").  19 U.S.C. § 1592(b) details enforcement procedures.  19 U.S.C. § 1592(b) ("Procedures").  Section 1592(b)(1)(A) provides, in general, that "[i]f *the Customs Service* has reasonable cause to believe that there has been a violation of subsection (a) of this section and determines that further proceedings are warranted, it shall issue to the person concerned a written notice of its intention to issue a claim for a monetary penalty."  19 U.S.C. § 1592(b)(1)(A) (emphasis added).

violated its "*duty* to administer the antidumping law in a manner to prevent evasion, *i.e.*, to prevent

exporters who receive high rates, and importers who purchase their products, from using a third

company's dumping rate to import goods at a margin rate lower than their own."  Pl.'s Reply Brief

at 10 (emphasis added).  In fact, the two cases contribute little to Mid Continent's position.

Notwithstanding Mid Continent's characterization, the language in Jia Farn to which Mid

Continent alludes states simply that, given the specific circumstances of that case, "Commerce acted

reasonably to prevent possible circumvention of antidumping duties."   Jia Farn, 17 CIT at 194, 817

F. Supp. at 975.  There is no mention of any affirmative "duty" on Commerce's part; nor does Jia

Farn refer to such an "obligation" or "responsibility" (or any other synonym for "duty") on the part

of the agency.

Tung Mung is only slightly more helpful to Mid Continent on the asserted existence of some

affirmative "duty."  Although the relevant section of the opinion is captioned "Department Fulfilled

its Duty of Preventing Circumvention of The Antidumping Statute," it is apparent from the pertinent

excerpt (quoted below), reinforced by a review of the decision itself, that the existence (or not) of

such a "duty" was not an issue before the Tung Mung court, and the court's use of the word "duty"

in the caption and in the text of the opinion in the case was not particularly deliberate or studied:

> As stated in the Remand Determination, Commerce has a *duty* to avoid the evasion
> of antidumping duties.  Remand Determination at 3.  "The ITA [International Trade
> Administration, within Commerce] has been vested with authority to administer the
> antidumping laws in accordance with the legislative intent.  To this end, the ITA has
> a certain amount of discretion [to act] . . . with the purpose in mind of preventing the
> intentional evasion or circumvention of the antidumping duty law."  Mitsubishi Elec.
> Corp. v. United States, 12 CIT 1025, 1046, 700 F. Supp. 538, 555 (1988), *aff'd*, 898
> F.2d 1577 (Fed. Cir. 1990).

> Defendant-Intervenors claim that [Commerce] has created a test which undermines
> this fundamental duty.

Tung Mung, 26 CIT at 978-79, 219 F. Supp. 2d at 1343 (emphasis added).[38]   The most that can be

said about the text quoted above is that either it gives no indication as to what authority (if any) the

Remand Results that are paraphrased in Tung Mung cited as support for Commerce's asserted

"duty," or – alternatively – that the support cited by the Remand Results was Mitsubishi.   And, as

the quote above makes plain, Mitsubishi actually says nothing about any "duty" on Commerce's part.

Instead, Mitsubishi refers to Commerce's *discretion* to act in order to "prevent[] the intentional

evasion or circumvention of the antidumping duty law."   Mitsubishi Elec. Corp. v. United States,

12 CIT 1025, 1046, 700 F. Supp. 538, 555 (1988), *aff'd*, 898 F.2d 1577 (Fed. Cir. 1990).

"Discretion" and "duty" are two very different things.[39]

> The facts of Mid Continent's two cases also lend little or no support to its position.   As

---

[38]In addition, immediately before the captioned "Conclusion" of the opinion, Tung Mung
sums up, referring once again – in passing, and without citation to any supporting authority – to
Commerce's asserted "duty": "Accordingly, Commerce has fulfilled its *duty* of preventing the
evasion of antidumping duties . . . ." Tung Mung, 26 CIT at 978, 219 F. Supp. 2d at 1344 (emphasis
added).

[39]Indeed, review of the quoted Mitsubishi excerpt, in context, reveals that Mitsubishi pairs
the concept of "discretion" with "authority" – again, two concepts that are very different from
"duty":

> [Commerce] has been vested with *authority* to administer the antidumping laws in
> accordance with the legislative intent.   To this end, [Commerce] has a certain amount
> of *discretion* to expand the language of a petition to encompass the literal intent of
> [an antidumping] petition, . . . with the purpose in mind of preventing the intentional
> evasion or circumvention of the antidumping duty law.

Mitsubishi, 12 CIT at 1046, 700 F. Supp. at 555 (emphases added).

discussed above, in Jia Farn, Commerce had received information that an exporter who was not subject to an existing antidumping duty order was helping other manufacturers evade the order by shipping their goods (which were subject to the order), thus aiding them in avoiding payment of antidumping duties. *See generally* Jia Farn, 17 CIT at 187-88, 817 F. Supp. at 970. The exporter brought the action at issue, seeking to enjoin Commerce from investigating the allegations through a "changed circumstances" proceeding and a then-ongoing administrative review. In brief and in summary, the focus of the decision in Jia Farn is the agency's authority to use the two types of proceedings despite the fact that the exporter was not covered by the relevant antidumping duty order. The court analyzed the statutes governing the two types of proceedings, and ruled that the agency was entitled to proceed, ultimately concluding generally that "Commerce acted reasonably to prevent possible circumvention of antidumping duties." *See* Jia Farn, 17 CIT at 190-94, 817 F. Supp. at 972-75. Significantly, in Jia Farn, the nature and extent of the evidence against the exporter was not at issue. In contrast, in the case at bar, there is no concrete evidence of any intentional evasion. Moreover, as noted above, nothing in Jia Farn suggests that Commerce has an affirmative *duty* to prevent evasion of antidumping duties. Instead, the case reflects a judicial determination that, in the exercise of the agency's *discretion*, Commerce had the *legal authority* to take the action that it took.

        In Tung Mung, a case involving "middleman dumping," the court concluded that Commerce properly declined to (in effect) penalize producers for dumping when there was no record evidence that they knew, or had any reason to know, that their merchandise would be "dumped" by a middleman. *See* Tung Mung, 26 CIT at 969-81, 219 F. Supp. 2d at 1334-44. Thus, Tung Mung

holds, in essence, that where – as here – there is no record evidence of a party's evasion, Commerce

acts properly by not imposing on the party what would, in effect, constitute a penalty.  *See id*., 26

CIT at 980-81, 219 F. Supp. 2d at 1344 (rejecting domestic industry's arguments, including, *inter*

*alia*, argument that "by not penalizing a producer considered not to be responsible for middleman

dumping," Commerce's use of combination rates "will further encourage . . . middleman dumping";

emphasizing that "[s]ince no evidence of collusion surfaced during verification of the producer and

the middleman, [the domestic producers'] argument amounts to pure speculation").

      In sum, although both decisions address Commerce's role vis-a-vis allegations of evasion of

antidumping duties, neither Jia Farn nor Tung Mung supports Mid Continent's claim that Commerce

failed to fulfill its obligations in this case, given the record facts here.   And, contrary to Mid

Continent's implication, neither case addresses whether or not Commerce has an affirmative "duty"

to prevent evasion of the antidumping statute, much less the nature and the precise metes and bounds

of any such duty.   Like Mid Continent's other arguments (discussed above), this one too must fail.

      3.  Mid Continent's Allegations of Inconsistent NME and Market Economy Practices

      Mid Continent's final argument attacks the liquidation determinations here as "contrary to

[Commerce's] approach to the same issue in cases involving market economy countries."  Pl.'s Brief

at 13; *see also id*. at 13-14; Pl.'s Reply Brief at 14.  As summarized below, although the argument

consumes but a few short paragraphs in Mid Continent's briefs, the argument raises potentially

significant concerns about the reasonableness of Commerce's practice.   Nevertheless, the

Government and Defendant-Intervenors give the argument short shrift in their briefs, and do not

grapple at all with its merits.  *See generally* Def.'s Brief at 17; Def.-Ints.' Brief at 36-38.  The matter

therefore must be remanded to Commerce for its consideration.[40]

Mid Continent argues that when an importer attributes an entry to a firm that did not report

sales to that importer during the period of review, Commerce's duty assessment practice should be

the same whether the administrative review is a market economy review or a non-market economy

("NME") review.  However, until recently, Commerce's methodologies have been inconsistent.  *See*

*generally* Non-Market Economy Antidumping Proceedings: Assessment of Antidumping Duties, 76

Fed. Reg. 34,046 (June 10, 2011) ("Proposed Policy Statement").  In NME administrative reviews

in the past, Commerce has instructed Customs to assess duties on such entries at the rate at which

they were entered into the United States (*i.e.*, the rate declared by the importer at the time of entry).

*Id.*, 76 Fed. Reg. at 34,046.  In contrast, in market economy reviews, Commerce (since 2003) has

instructed Customs to assess duties not at the rate entered into the United States, but, rather, at the

"all-others" rate.  *Id.*

As support for its argument, Mid Continent highlights the fact that Commerce recently

changed its policy in order to address this inconsistency in agency practice.  Specifically, after the

Final Results issued in this case, Commerce published notice of a proposal designed to conform the

agency's approach to the assessment of antidumping duties in NME proceedings in the

circumstances outlined above to the agency's practice in market economy cases.  *See* Pl.'s Brief at

---

[40]It does not appear that Mid Continent included this argument in its administrative case brief, or otherwise raised the argument at the administrative level.  However, neither the Government nor Defendant-Intervenors have argued that consideration is barred by the doctrine of exhaustion.  *See* *generally* section III.A.1, *supra*.

13-14 (*citing* Proposed Policy Statement, 76 Fed. Reg. at 34,046-47); *see also* Pl.'s Reply Brief at

14.  The Proposed Policy Statement was finalized before briefing in this action was complete.  *See*

Non-Market Economy Antidumping Proceedings: Assessment of Antidumping Duties, 76 Fed. Reg.

65,694 (Oct. 24, 2011) (finalizing Proposed Policy Statement) ("Final Policy Statement").[41]

_____

[41]Commerce's Proposed Policy Statement contrasted Commerce's practice in market economy proceedings with its practice in NME proceedings:

> In the past, in both [market economy] and NME cases, [Commerce] instructed [Customs] to assess [antidumping] duties on entries not examined and/or not otherwise covered by the final results of review for a firm that was subject to the review at the rate at which the merchandise entered the United States, *i.e.*, at the cash-deposit rate in effect at the time of entry.  However, in May 2003, [Commerce] announced a change to its practice.  In [market economy] cases with an anniversary month of May 2003 or later, [Commerce] began instructing [Customs] to assess duties at the rate applicable to a party that did not have its own antidumping duty rate, *i.e.*, the all-others rate, on entries that were suspended at the deposit rate of the producer subject to review but that were not covered by the final results of review for that firm subject to review.  *See* Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties, 68 [Fed. Reg.] 23954 (May 6, 2003) ("2003 Antidumping Duties Notice").  In other words, to the extent that a firm did not report sales to a particular importer or customer during a given review period, the customer or importer is not entitled to a rate that [Commerce] previously established for that firm.  [Commerce] stated that its prior practice "often result[ed] in the use of an inaccurate rate for duty assessment where [Commerce] conduct[ed] a review.  [T]he duty rate for non-reviewed resellers (which do not have their own rate and where the deposit rate at the time of entry becomes the final rate of duty) is based on a previous review of the producer's selling experience, not the reseller's selling experience." *Id.*, 68 [Fed. Reg.] at 23955.

> Because discussions had not fully explored [Commerce's] revised practice in the NME context, to date, [Commerce] has not applied the 2003 Antidumping Duties Notice in NME cases.  Nevertheless, in both [market economy] and NME proceedings, [Commerce] maintains an interest in having entries liquidated in a manner that is consistent with the final results of its administrative reviews.  *Id.*, 68 [Fed. Reg.] 23958.

Neither the Government nor Defendant-Intervenors have responded directly to Mid Continent's challenge to the (apparently now resolved) inconsistency between Commerce's practice in market economy *versus* NME proceedings.  Instead, the Government and Defendant-Intervenors assert that Mid Continent's argument lacks merit because the Proposed Policy Statement was released more than a month after the Amended Final Results were issued and is explicitly prospective in nature.  *See* Def.'s Brief at 17; Def.-Ints.' Brief at 37 n.3; *see also id*. at 36-37 (arguing that policy statement "does not affect the entries subject to this civil action").  But the heart of Mid Continent's argument is not that Commerce's liquidation instructions in this action are inconsistent with Commerce's new policy for NME proceedings.  Mid Continent's argument is much more fundamental – that is, that Commerce's liquidation instructions in this action (an NME review) are not consistent with the agency's practice in market economy proceedings, and that this inconsistency renders the liquidation instructions unreasonable.  Pl.'s Brief at 14.  In other words, Commerce's change in policy provides support for Mid Continent's argument; but the policy change is not the basis for the argument.  The points that the Government and Defendant-Intervenors make concerning the timing of the Policy Statement therefore miss the mark.[42]

---

Proposed Policy Statement, 76 Fed. Reg. at 34,046-47.

[42]Defendant-Intervenors also contend that Mid Continent misconstrues the scope of the policy refinement.  Def.-Ints.' Brief at 36-38.  Defendant-Intervenors point to language in the Final Policy Statement which indicates that Commerce evaluates export transactions "on a case-by-case basis within the context of an administrative review" and that Commerce "is able to examine additional documentation to decide which entity was the exporter for purposes of making NME [antidumping] determinations."  *Id*. at 37-38 (*quoting* Final Policy Statement, 76 Fed. Reg. at 65,695).  But this clarification of the meaning of the term "exporter" in the Final Policy Statement does not establish that Mid Continent has misconstrued the scope of the policy refinement.

The Final Policy Statement explains that the goal of the practice of liquidating non-reviewed entries at the countrywide rate in market economy proceedings is "the accurate assignment of duties based on information obtained in a review," which "is not unique to [market economy] proceedings but is necessary in all antidumping proceedings."  Final Policy Statement, 76 Fed. Reg. at 65,695. The Final Policy Statement also notes that, with the adoption of the change in policy, Commerce's liquidation practices in NME proceedings are "consistent with . . . the same liquidation practice in market economy . . . proceedings."  *Id.*

There may be a reasonable basis for Commerce's decision to take an approach to liquidation in this review that seems to conflict with its approach in market economy proceedings.  However, no such rationale appears on the existing record.  Remand is therefore necessary.

On remand, Commerce shall address all facets of Mid Continent's argument, including specifically whether, in light of their status, the entries initially mis-attributed to CPI fall within the scope of the Final Policy Statement.  In addition, more generally, Commerce shall, *inter alia*, articulate its rationale for not applying the NME-wide rate to those entries given the agency's longstanding practice in market economy proceedings.  To the extent that Commerce on remand may conclude that it is appropriate to apply the NME-wide rate to some or all of the entries at issue, Commerce shall detail the basis for that determination.

## IV.  <u>Conclusion</u>

For the reasons set forth above, Mid Continent's Motion for Judgment on the Agency Record is granted in part and denied in part.  Mid Continent's motion is denied as to Commerce's selection

of mandatory respondents for individual review; and Mid Continent's motion is granted as to Commerce's liquidation instructions for entries initially mis-attributed to CPI, to the extent explained above.

This matter is remanded to the U.S. Department of Commerce for further action not inconsistent with this opinion.  A separate order will enter accordingly.

/s/ Delissa A. Ridgway

_____

Delissa A. Ridgway
Judge

Dated:  August 30, 2013
         New York, New York