**Slip Op. 18-134**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**THE STANLEY WORKS (LANGFANG) FASTENING SYSTEMS CO., LTD. AND THE STANLEY WORKS/STANLEY FASTENING SYSTEMS, LP,**

Plaintiffs,

**MID CONTINENT NAIL CORP.,**

Consolidated Plaintiff

v.

**UNITED STATES,**

Defendant.

**MID CONTINENT NAIL CORP., ITOCHU BUILDING CORP., INC., CERTIFIED PRODUCTS INTERNATIONAL INC., CHIIEH YUNG METAL IND. CORP., HUANGHUA JINHAI HARDWARE PRODUCTS CO., LTD., TIANJIN JINGHAI COUNTY HONGLI INDUSTRY & BUSINESS CO., LTD., TIANJIN JINCHI METAL PRODUCTS CO., LTD., SHANDONG DINGLONG IMPORT & EXPORT CO., LTD., TIANJIN ZHONGLIAN METALS WARE CO., LTD., HENGSHUI MINGYAO HARDWARE & MESH PRODUCTS CO., LTD., HUANGHUA XIONGHUA HARDWARE PRODUCTS CO., LTD., WINTIME IMPORT & EXPORT CORPORATION LIMITED OF ZHONGSHAN, SHANGHAI JADE SHUTTLE HARDWARE TOOLS CO., LTD., ROMP (TIANJIN) HARDWARE CO., LTD., CHINA STAPLE ENTERPRISE (TIANJIN) CO., LTD., AND QIDONG LIANG CHYUAN METAL INDUSTRY CO., LTD.**

Defendant-Intervenors.

**Before: Jane A. Restani, Judge**

**Consol. Court No. 11-00102**

**OPINION**

[Commerce's final determinations on remand in its administrative review of an antidumping duty covering steel nails from China are sustained.]

Dated: October 5, 2018

Lawrence J. Bogard, Neville Peterson LLP, of Washington, D.C., for Plaintiffs The Stanley Works (Langfang) Fastening Systems Co., Ltd. and The Stanley Works/Stanley Fastening Systems, LP.

Stephen C. Tosini, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., for the defendant. With them on the briefs were Tara K. Hogan, Senior Trial Counsel Stuart F. Delery, Assistant Attorney General, Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the briefs was Zachary Simmons, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Adam H. Gordon, The Bristol Group PLLC, of Washington, D.C., for Consolidated Plaintiff, Defendant-Intervenor Mid Continent Nail Corporation. With him on the brief was Ping Gong, of Washington, D.C.

Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., for consolidated Defendant-Intervenors Itochu Building Products Co., Inc., et al. With him on the brief were Bruce M. Mitchell and Kavita Mohan, of New York, N.Y., and Elaine F. Wang, of Washington, D.C.

**Restani, Judge**: Before the court are the U.S. Department of Commerce ("Commerce")'s Final Results of Redetermination Pursuant to Court Remand Order in The Stanley Works (Langfang) Fastening Systems Co. v. United States, Ct. No. 11-102, Doc. No. 108 (Mar. 5, 2014) ("Stanley Remand Results"), Commerce's Final Results of Redetermination Pursuant to Partial Remand Order in The Stanley Works (Langfang) Fastening Systems Co. v. United States, Ct. No. 11-102, Doc. No. 151 ("Partial Remand Results") (Apr. 16, 2015), and Redetermination Pursuant to Court Order Granting Defendant's Motion for Voluntary Remand in Mid Continent Nail Corporation v. United States, Ct. No. 11-119, Doc. No. 158 (Nov. 13, 2015) ("Second Mid

Continent Remand Results")[1] concerning the first administrative review, as amended, for the period January 23, 2008, through July 31, 2009 ("POR"), of the antidumping ("AD")[2] order on certain steel nails from the People's Republic of China ("PRC").[3] See also Certain Steel Nails from the People's Republic of China: Final Results of the First Antidumping Duty Administrative Review, 76 Fed. Reg. 16,379 (Mar. 23, 2011) ("Final Results"); Certain Steel Nails from the People's Republic of China: Amended Final Results of the First Antidumping Duty Administrative Review, 76 Fed. Reg. 23,279 (Apr. 26, 2011) ("Amended Final Results").[4] For the reasons stated below, Commerce's final remand results are sustained.

**BACKGROUND**

The court assumes that all parties are familiar with the facts of this consolidated action as discussed in two previous court opinions issued prior to remand. The Stanley Works (Langfang) Fastening Systems Co. v. United States, 964 F. Supp. 2d 1311 (CIT Sept. 3, 2013) ("Stanley I"); Mid Continent Nail Corp. v. United States, 949 F. Supp. 2d 1247 (CIT Aug. 30, 2013) ("Mid

---

[1] Commerce's Second Mid Continent Remand Results corrected an error from an earlier redetermination. See Final Results of Redetermination Pursuant to Mid Continent Nail Corporation v. United States, Ct. No. 11-119, Doc. No. 109 (March 5, 2014) ("First Mid Continent Remand Results").

[2] Dumping is defined as the sale of goods at less than fair value, calculated by a fair comparison between the export price or constructed export price for the U.S. market and normal value in the home market. See 19 U.S.C. §§ 1677(34), 1677b(a).

[3] This matter was transferred to the current judge on September 4, 2018. Order of Reassignment, Doc. No. 190 (Sept. 4, 2018). A telephone conference was held on September 13, 2018, to clarify which issues remained sub judice.

[4] The Amended Final Results corrected two ministerial errors. Commerce miscalculated the surrogate financial ratios of Nasco Steels Private Ltd. ("Nasco"), which were used in Stanley's margin calculations. It also miscalculated the net change in inventory. The changes affected the margin calculations for Stanley, changing them from 13.90 percent to 10.63 percent, which in turn affected the margin for the separate-rate companies. See 76 Fed. Reg. at 23,280.

Continent I"); see also Order of Remand, Doc. No. 156 (Sept. 30, 2015). For the sake of convenience, the facts relevant to the remaining consolidated issues arising from Commerce's multiple remand results are summarized here.[5]

To calculate the final dumping margin, Commerce elected to use financial data from three surrogate companies, Bansidhar Granites Private Limited ("Bansidhar"), J&K Wire & Steel Industries ("J&K"), and Nasco Steels Private Ltd. ("Nasco"), because those companies produced steel nails, an "identical" product, rather than products comparable to the subject merchandise. See Certain Steel Nails from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the First Antidumping Duty Administrative Review, A-570-909, POR 01/23/08-07/31/09, at cmt. 2 (Dep't Commerce Mar. 14, 2011) ("I&D Memo"). By contrast, Commerce did not use financial statements from Sundram Fasteners Ltd. ("Sundram") because it found that Sundram did not manufacture steel nails or products comparable to the subject merchandise. See id. In its determination, Commerce emphasized that Bansidhar, J&K, and Nasco invested in equipment required to produce nails and consume steel wire rod ("SWR") as their main input. Id. at cmt. 3. Accordingly, using the data from these three companies, Commerce determined that the weighted average dumping margin was 10.63 percent. See 76 Fed. Reg. at 23,280.

Commerce, however, in the second administrative review for the period August 1, 2009, through July 31, 2010, of the AD order on certain steel nails from the PRC, refined its practice for determining whether a company is reasonably considered a producer of "identical" or

---

[5] On September 16, 2011, the court partially consolidated counts II through IV and counts VII through X of Mid Continent's complaint in Mid Continent Nail Corporation v. United States, Ct. No. 11-00119 (the "Mid Continent litigation") into the Stanley litigation. See Order of Partial Consolidation, Doc. No. 33 (Sept. 16, 2011). The court has now fully consolidated the two actions for the purpose of issuing one judgment affecting the final administrative review.

"comparable" merchandise. See Certain Steel Nails from the People's Republic of China: Final Results and Final Partial Rescission of the Second Antidumping Duty Administrative Review, 77 Fed. Reg. 12,556 (Dep't Commerce Mar.1, 2012) ("AR2 Final Results"); Certain Steel Nails from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Second Antidumping Duty Administrative Review, A-570-909, POR 08/01/09-07/31/10, at cmt. 2 (Dep't Commerce Mar. 1, 2012) ("AR2 I&D Memo"). Commerce determined that, where "detailed evidence is available in the record of the proceeding," it will analyze a company's "product mix," drawing a "link between the amount of identical merchandise and the resulting ratios." AR2 I&D Memo at cmt. 2. In the light of Commerce's refined practice, the court granted the Government's remand request for Commerce to reevaluate its determination concerning surrogate financial ratios. See Stanley I, 964 F. Supp. 2d at 1342.

On March 5, 2014, Commerce issued the Stanley Remand Results. Commerce applied its "refined practice" and reclassified Nasco and Bansidhar as producers of comparable merchandise. Stanley Remand Results at 3. It also found Sundram a producer of comparable merchandise but excluded J&K as a producer of non-comparable merchandise. Id. at 4, 5. Accordingly, Commerce revised the margin for Stanley, the sole mandatory respondent, and that of the separate rate companies from 10.63 percent to 15.43 percent. See id. at 14. Commerce also found that all four companies showed no receipt of countervailable subsidies, that the differences in the companies' scale of production did not render the use of the data unreasonable, that the consumption of SWR is not determinative where a company is a producer of comparable merchandise, and that Sundram's financial ratios were not aberrational. Id. at 3–5, 13.

The Stanley Works (Langfang) Fastening Systems Co., Ltd. and The Stanley Works/Stanley Fastening Systems, LP. (collectively "Stanley") challenge Commerce's inclusion

of Sundram's financial statements in calculating surrogate financial ratios. Plaintiffs' Comments on First Final Results of Redetermination, Doc. No. 115, at 5–37 ("Pl. Cmts."). Stanley first argues that Commerce improperly found no reason to believe or suspect that Sundram may have received countervailable subsidies because record evidence established that Sundram received subsidies through interest free sales tax loans from the state government of Tamil Nadu,[6] deferred government grants, a plant location in a Special Economic Zone (SEZ), and a deduction through Section 35(2AB) of India's Income Tax Act. Pl. Cmts. at 11–23. Stanley claims that Commerce incorrectly applied the "reason to believe or suspect standard" and that "generally available information," including a determination by the European Union ("EU"), demonstrated that Sundram received subsidies. Pl. Cmts. at 6–11, 19–23. Stanley then argues that Sundram's manufacturing overhead ratio is aberrational and distortive because its ratio is seven times higher than that of the other surrogate companies. Plaintiffs' Comments on the Final Results of Redetermination Pursuant to Partial Remand Order, Doc. No. 154, at 8–15 ("Pl. Opp. Cmts."). Finally, Stanley challenges Commerce's exclusion of J&K as unreasonable and unsupported by substantial evidence because J&K manufactured nails using SWR and had invested in equipment necessary to produce nails, while Sundram produced no nails. Pl. Cmts. at 37–40. Stanley requests a third remand to address these issues. Pl. Opp. Cmts. at 18.

Mid Continent Nail Corporation ("Mid Continent") and the Government argue that Commerce properly applied its refined practice and reasonably included Sundram's financial statements while excluding J&K's. Comment of Defendant United States on First Final Results of Redetermination, Doc. No. 118, at 16–19 ("Def. Cmts."); Comments of Defendant-Intervenor Mid Continent Nails Corporation on First Final Results of Redetermination, Doc. No. 125, at 5–

[6] Tamil Nadu is a state in Southern India.

12 (“Def.-Int. Cmts.”). The Government and Mid Continent argue that, given the limited number of available surrogate financial data, the overhead ratio figures reflect a reasonable variation that cannot be characterized as aberrational. Comment of Defendant United States on Second Final Results of Redetermination, Doc. No. 156, at 8–10 (“Def. Resp.”); Def.-Int. Cmts. at 8–11. They also argue that the “reason to believe or suspect” standard was properly applied and the finding that Sundram did not receive countervailable subsidies was permissible given the information available on the record. Def. Cmts. 7–16; Def.-Int. Cmts. 12–23.

In the Mid Continent action, the court twice remanded the matter for Commerce to address Commerce’s liquidation rate determination for various entries that received Certified Products International, Inc. (“CPI”)’s combination rates. See Mid Continent I, 949 F. Supp. 2d at 1287; Remand Order, Doc. No. 156 (September 30, 2015). On remand, Commerce applied the revised 15.43 percent rate determined in the Stanley Remand Results to the open entries with CPI combination rates. Second Mid Continent Remand Results at 7. After Commerce’s second redetermination on remand, there was no further challenge as to which entries would receive the CPI combination rates. See id. at 2. Thus, the court will not address the issue further.

Itochu Building Products Co., Inc., Certified Products International Inc., and certain Chinese producers (collectively “Itochu”) argue that the revised rate calculated in the Stanley Remand Results cannot apply to the separate rate respondents with CPI combination rates because they were not subject to the injunction of liquidation in the Stanley litigation. Comments of Defendant-Intervenor Itochu Building Products on Final Results of Redetermination, Doc. No. 117, at 1–20 (“Itochu Cmts.”).

Accordingly, two issues remain before the court: whether Commerce reasonably included Sundram’s financial ratios in the calculation of Stanley’s dumping margin and whether

Commerce's decision to apply the revised 15.43 percent rate to the entries not associated with Stanley was contrary to law.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). The court upholds Commerce's final results in an antidumping duty review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. Commerce Reasonably Selected Sundram's Surrogate Financial Statements

Commerce acted reasonably in using Sundram's financial statements in its calculation of surrogate values because the record evidence did not provide it with a reason to believe or suspect that Sundram may have received countervailable subsidies and Sundram's overhead ratios are not aberrational or distortive. Moreover, Commerce acted reasonably in excluding J&K's financial statements because it found, in accordance with its refined practice, that J&K was not a producer of comparable merchandise.

#### A. Countervailing Duties

In nonmarket economy antidumping duty cases, Commerce determines "the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1)(B). In calculating normal value, "the valuation of the factors of production [is] based on the best available information regarding the values of such factors in a [surrogate] market economy." Id. In valuing such factors of production, Commerce derives surrogate financial ratios from publicly available financial statements of producers of identical or comparable merchandise in market economies. See 19

C.F.R. § 351.408(c). Congress, however, has instructed Commerce to "avoid using any prices which it has reason to believe or suspect may be dumped or subsidized" and to base its decision on "information generally available to it at that time," without conducting a formal investigation. See Omnibus Trade and Competitiveness Act of 1988, H.R. REP. No. 100-576, at 590–91 (1988) (Conf. Rep.).

Generally, Commerce must demonstrate by "particular, specific, and objective evidence" that "(1) subsidies of industry in question existed in supplier country during period of investigation[]; (2) supplier in question was member of subsidized industry or otherwise could have taken advantage of any available subsidies; and (3) it would have been unnatural for supplier to not have taken advantage of such subsidies." China Nat'l Mach. Imp. & Exp. Corp. v. United States, 264 F. Supp. 2d 1229, 1243 (CIT 2003); Fuyao Glass Indus. Group Co. v. United States, 29 CIT 109, 114 (2005) ("Fuyao II"). Moreover, normally, Commerce excludes a financial statement from consideration if a line item "contains a reference to a specific subsidy program found to be countervailable in a formal CVD determination," and includes it if it "contains only a mere mention that a subsidy was received, and for which there is no additional information as to the specific nature of the subsidy." Clearon Corp. v. United States, 800 F. Supp. 2d 1355, 1359 (CIT 2011). For example, Commerce excluded a financial statement that referenced three types of "Capital Subsidy/Government Grants," which Commerce found countervailable in a prior administrative proceeding, in line items indicating that it received multiple forms of government aid. See Clearon, 800 F. Supp. 2d at 1358–61 (citing Chlorinated Isocyanurates from the People's Republic of China, 75 Fed. Reg. 70,212 (Dep't Commerce Nov. 17, 2010)). By contrast, Commerce included a financial statement where an accounting note indicated that a benefit would be recorded "as and when" it is received, but where no benefit

attributed to the scheme was recorded. DuPont Teijin Films v. United States, 896 F. Supp. 2d 1302, 1311 (CIT 2013); see also Catfish Farmers of Am. v. United States, 641 F. Supp. 2d 1362, 1380 (CIT 2009) (affirming Commerce's determination of no subsidy when petitioners identified a subsidy "without additional substantiating evidence of countervailability").

Stanley argues that Commerce had a reason to believe or suspect that Sundram may have received countervailable subsidies from two government programs: Interest Free Sales Tax Loans from the Government of Tamil Nadu and Deferred Government Grants. Stanley largely rests its argument on Commerce's previous finding that the tax loans and government grants were countervailable. Pl. Cmts. at 12–18 (citing Certain Helical Spring Lock Washers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 75 Fed. Reg. 29,720 (Dept. Commerce May 27, 2010) ("Lock Washers")). First, Commerce found that Lock Washers incorrectly stated that a prior administrative review found "Interest Free Sales Tax Loans from the Government of Tamil Nadu" countervailable. Stanley Remand Results at 10. The review, however, determined that "Interest Free Tax Loans from the Government of Maharashtra" were countervailable. Id. (emphasis added). Thus, Commerce did not conclude that the tax loans at issue were countervailable. Second, although Lock Washers found that "Deferred Governments Grants" may be countervailable, Commerce asserts that this finding deviated from Commerce's general practice of requiring more than a notation of a subsidy received in a set of financial statements to exclude it from consideration. Id. at 11. Commerce is not bound by its previous administrative reviews and reasonably chose not to rely on Lock Washers. Given that Sundram's financial statement plainly states that it "has not received any grant from the Government," Commerce's decision is supported by substantial evidence. See Mid Continent Surrogate Value ("SV") Submission at 932, PD 301 (Oct. 5, 2010).

Stanley also asserts that Sundram's location in a Special Economic Zone provides a compelling reason to believe or suspect that Sundram received countervailable subsidies. Pl. Cmts. at 22. As the court recently stated, the mere location of Sundram's factories in a SEZ does not suggest receipt of a specific subsidy. Itochu Building Products Co., Inc. v. United States, Slip Op. 18-24, 2018 WL 1445676, at *6 (CIT Mar. 22, 2018) ("Itochu II"); Stanley Remand Results at 11. Indeed, benefits from Indian's SEZ program "are not provided automatically" and, in some instances, companies within the SEZ must "apply and qualify for the benefits of the [program]." Stanley Remand Results at 11. The record does not contain particular, specific, and objective evidence to suggest that Sundram has taken advantage of any available subsidies. Commerce's decision as to the SEZ, therefore, was supported by substantial evidence.

Similarly, Stanley contends that Sundram's citation to its eligibility for a weighted deduction under Section 35(2AB) of the Income Tax Act in its financial statement provides a reason to believe or suspect that Sundram received countervailable subsidies. Pl. Cmts. at 19–23. Moreover, Stanley states that Commerce failed to consider an EU determination that found Section 35(2AB) to be a countervailable subsidy, arguing the determination was generally available information that should have been considered. Pl. Cmts. at 19–23 (citing Council Regulation (EC) 1176/2008 of November 27, 2008, amending Council Regulation (EC) No 713/2005 imposing a definitive countervailing duty on imports of certain broad spectrum antibiotics originating in India, 2008 O.J. (L 319) 10–13 ("EU Determination")). While cited by Stanley in its comments to the first remand results, the EU Determination itself is not in the record.[7] See Stanley Remand Results at 8; 19 U.S.C. § 1516a(b)(1)(B)(i) (limiting the scope of

[7] Stanley requests that Commerce reopen the record on remand and accept submission of the EU Determination, putting it in an awkward position of arguing that Commerce did not rely on evidence that Stanley failed to introduce into the record. See Pl. Cmts. at 21 n.10; QVD Food

judicial review to the administrative record). Further, citation alone to an EU Determination does not render it "generally available information" adequate for Commerce to make a finding without conducting an investigation. Therefore, the EU Determination was not in the record and Commerce reasonably did not consider it.

Regardless, Commerce's conclusion does not rest on a finding that Section 35(2AB) was not countervailable. Compare Itochu Buildings Products Co. v. United States, Slip Op. 17-66, 2017 WL 2438835, at *4 (CIT June 5, 2017) (remanding to Commerce following Commerce's erroneous statement that the EU did not review Section 25(2AB)) with Itochu II, at *7 (finding that, even in the light of the EU decision, Commerce properly continued to include Sundram's statement when averaging the surrogate values). Rather, Commerce concluded that Sundram's financial statement showed no indication that the company "actually [had] been approved and used this program," even if their projects were "eligible" for it. Stanley Remand Results at 12. The financial statement states only that certain R&D projects are "eligible for weighted deduction under Section 35(2AB)." See Mid Continent SV Submission at 896, 995. Thus, Commerce found nothing more than a mere mention of a subsidy without any further substantiating reference to the nature of the subsidy.

Although Stanley does not provide evidence that Sundram received a subsidy, it asks the court to infer that "it would have been unnatural" for Sundram to include its program's eligibility status in its annual report without taking advantage of it. Pl. Cmts. at 22–23 (citing Fuyao II at 264 F. Supp. at 1243). Yet Commerce, in accordance with its practice, could reasonably refuse

---

Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (finding "no suggestion that the [relevant] report was not publicly available . . . when Commerce invited . . . interested parties to submit relevant factual information for valuing factors of production"). Similarly, here, the burden of creating an adequate record lies with interested parties and not with Commerce. The court will not take judicial notice of the contents of the EU Determination.

to speculate, without particular, specific, and objective evidence that Sundram was approved to benefit from the program or that it actually received such benefits during the relevant POR.

In sum, Stanley's argument fails because it asks the court to choose between two reasonable interpretations of the financial statements. See Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) ("[D]rawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."). Stanley's claim that certain programs provide Commerce with substantial evidence to support a reason to believe or suspect that Sundram may have received countervailable subsidies is not without force. But Commerce's conclusion that it did not have sufficient reason to believe or suspect that Sundram's prices were subsidized is supported by substantial evidence. Thus, Commerce's refusal to arrive at Stanley's proposed interpretation is reasonable based on the administrative record, which contained only mere mentions of subsidies in a financial statement without additional substantiating evidence of countervailability.

**B. Exclusion of J&K data**

On remand, Commerce looked at each producer's "product mix" to determine whether it is reasonably considered a producer of "comparable" or "identical" merchandise. Commerce found that Bansidhar "produced bolts, nails, and wire, representing 57.22, 15.70, and 27.08 percent of production, respectively" and that Nasco produced "hinges, nails, and blades, representing 68.83, 12.61, and 18.56 percent of production, respectively." Stanley Remand Results at 3–4. By contrast, Commerce found that, although J&K produced nails, representing 16.69 percent of its sales, its activities related primarily to the production and sale of wire, a non-comparable merchandise, representing 83.31 percent of sales. Id. at 4–5. Therefore, it concluded that J&K was not a suitable surrogate financial company. Id. at 5. Commerce

continued to find that Sundram produced comparable merchandise, where data showed that 42.61 percent of its income was tied to fasteners. Id. at 4. Because Commerce found that bolts, hinges and fasteners are comparable merchandise, it averaged Bansidhar, Nasco, and Sundram's financial statements for surrogate value calculations.[8] Id. at 5.

It is within Commerce's expertise and discretion to update its methodology for both increased accuracy and ease of use. See SKF USA Inc. v. United States, 491 F. Supp. 2d 1354, 1362 (CIT 2007). Commerce's updated methodology considers whether a company's main line of business is in "identical" or "comparable" merchandise. Here, on remand, Commerce reasonably applied the practice developed in the second administrative review.

**C. Overhead Ratios**

On remand, Commerce mistakenly used Nasco's overhead ratio calculated in the Final Results (29.29 percent), rather than that used in the Amended Final Results (3.68 percent), when comparing its ratio with Sundram's to explain why Sundram's overhead ratios were not aberrational. See Stanley Remand Results, at 13 (stating that Nasco's overhead ratio is seven times higher than Bansidhar's). Recognizing its error, Commerce requested a partial remand limited to the reexamination of the manufacturing overhead ratios. Remand Scheduling Order, Doc. No. 148, at 2 (Feb. 18, 2015). On February 18, 2015, the court granted Commerce's request. Id. On partial remand, Commerce continued to find Sundram's overhead ratio appropriate. See Partial Remand Results at 3–4. Finding no "extraordinary" items within Sundram's financial statement, Commerce decided that inherent variations in overhead ratios

---

[8] Although in the Final Results Commerce found that Sundram did not produce merchandise comparable to nails, that decision largely focused on its determination that Sundram does not consume SWR. Indeed Stanley I found that Commerce did not "carefully consider[] all relevant evidence on the record" or address Mid Continent's argument that "both nails and screws/fasteners are produced from steel wire and [SWR]." 964 F. Supp. 2d at 1335.

derived from a limited number of available financial statements from producers of comparable merchandise with different product mixes cannot provide a basis for finding one company's ratio aberrationally high or the other companies' aberrationally low. Id at 3–4, 7.

In response to the Partial Remand Results, Stanley argues that Commerce's determination is unlawful and unsupported by substantial evidence. Pl. Opp. Cmts. at 8. Stanley contends that selecting a company whose overhead ratio is seven times higher than other surrogates "falls outside the limits of permissible approximation." Id. at 10 (quoting Sigma Corp. v. United States, 117 F.3d 1401, 1408 (Fed. Cir. 1997)). Stanley essentially claims that manufacturing nails in India typically requires an overhead of about four percent based on Nasco's and Bansidhar's overhead ratios. Stanley, however, fails to establish that those overhead ratios represent that of a typical nail producer. Pl. Opp. Cmts. at 12–14. For its part, Commerce determined that the overhead ratios of those two producers, who primarily produce goods other than nails, are not a sufficient evidentiary basis to state definitely what a "typical" nail producer requires. Partial Remand Results at 7.

The court agrees. Given that Commerce reasonably concluded that Sundram, Nasco, and Bansidhar are producers of comparable merchandise, the differences between their overhead ratios, alone, cannot provide evidence of aberration. If that were the case, it would be as reasonable to conclude that Nasco and Basidhar's ratios are aberrationally low. Commerce's policy is to use as many financial ratios of producers of comparable merchandise as possible, so "as to normalize any inherent variations therein." Partial Remand Results at 4. Accordingly, Commerce's finding that Sundram's overhead ratios were not aberrational or distortive of the surrogate financial data is supported by substantial evidence, and could be included in the averaging of financial data for surrogate value purposes.

## II. Commerce's Recalculated Dumping Margin Applies to the Separate Rate Respondents

In the Mid Continent Remand, Commerce applied the revised 15.43 percent dumping margin calculated from the Stanley Remand Results to the separate rate companies. Second Mid Continent Remand Results at 7. Itochu contends that the rate for the separate companies ("SRC") in the Mid Continent action should have remained at 10.63 percent, the amount calculated in the Amended Final Results. Itochu argues that the outcome of the Stanley Remand Results should not affect the SRC liquidation rates because the liquidation of their entries was not enjoined in the Stanley litigation, pointing to the fact that Stanley was removed from the Mid Continent injunction post-consolidation and a letter stating that issues currently before the court "are Stanley-specific and do not affect [them]." Itochu Cmts. at 7–8, 17.[9]

Itochu's claims are without merit. The two actions arise out of the same administrative review, where Stanley is the sole mandatory respondent. See I&D Memo at 1. It is Commerce's normal practice "to assign non-investigated separate rate respondents a rate based on the average of the margins calculated for those companies selected for individual review." First Mid Continent Remand Results at 34 (citing Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam, 76 Fed. Reg. 56,158 (Sept. 12, 2011)). Accordingly, in Sigma Corp., the court rejected Commerce's use of a mandatory respondent's invalidated dumping margin as the "best information available" in its determination of the all-others rate. 117 F.3d at 1411–12. The court held that the other exporter's rate "stood or fell with [the mandatory respondent's] rate." Id. at 1411. Here, because Stanley was the sole company selected for review,

---

[9] Parties requiring a court ruling need to file motions. One-sided views stated in letters are of no legal moment.

Commerce's revisions to Stanley's rate would be expected to affect all open entries. That the liquidation of entries was enjoined in one action or another does not bear on this practice.

Itochu's argument that the dumping rate applied in the Mid Continent action was "borrowed from a wholly separate proceeding" is also unavailing. See Itochu Cmts. at 13. First, Itochu should not have assumed that matters affecting Stanley's dumping margin would not affect the separate rate companies. Indeed, Mid Continent specifically alleged several claims as to the calculation of the sole mandatory respondent's dumping margin that were only later consolidated into the Stanley action. See Mid Continent Complaint, Doc. No. 11, at 4 (May 11, 2011). Liquidation of entries of concern to Itochu were enjoined in the Mid Continent action and Itochu intervened therein. All parties should have understood that Commerce was relying on Stanley's rate as the best information available to be applied against the separate rate companies. To protect the rate that applied to the separate rate companies, Itochu could have participated more fully in the Stanley litigation and defended Stanley's previous rate.

Second, because Stanley began an action of its own, with a separate preliminary injunction, it would have been redundant to have Stanley covered by the Mid Continent injunction. See Preliminary Injunction Order, Doc. No. 13, at 2 (May 20, 2011). It was therefore appropriate to remove Stanley from the Mid Continent injunction, given the small possibility that conflicting injunctions with differing liquidation instructions could arise if two separate injunctions applied to Stanley. See 19 U.S.C. § 1516a(e)(2) (liquidation in accordance with the final court decision if liquidation is enjoined). Likewise, the parties were not required to add the separate rate companies to the Stanley injunction. Crucially, the separate rate respondents were not removed from the Mid Continent injunction, and their rates could not be divorced from the calculated rate for the mandatory respondent. Therefore, Commerce's

decision to apply the assessment rate of 15.43 percent to the separate rate companies was not contrary to law.

**CONCLUSION**

For the foregoing reasons, the court sustains Commerce's determinations in all challenged respects. All entries enjoined under 19 U.S.C. § 1516a(c)(2) are to be liquidated in accordance with the final disposition in this action as provided for in 19 U.S.C. § 1516a(e).

___/s/ Jane A. Restani______
Jane A. Restani, Judge

Dated: October 5, 2018
New York, New York